Superior Court of Cincinnati.
General Term, 1901.

## JOHN F. RUNCK v. FRANCIS H. CLOUD.

(1.) In the absence of prohibitory statutes a combination or compact for the simple purpose of controlling prices and thus restricting competition, is not of such illegality as will confer a right of action upon those injuriously affected by it, not members of the association.

(2.) One has a right to decline to contract, deal, or to do business with another, no matter what the motive compelling the declination may be and whatever one may lawfully decline to do singly, two or more may jointly agree not to do.

(3.) An association of insurance agents,

companies and underwriters for the purpose of regulating the rates of insurance and restricting competition and the members thereof are not liable for damages or injunction at the suit of a non-member of the association, for refusing to transact business with him, so long as he remains outside of the association, nor for compelling their members upon penalty of fine or expulsion from the association to refuse to have an office with him, or to recognize him in any way, in the insurance business.

(4.) Such assessment of penalties on the members of the association, does not amount to coercion, where the same have been assumed by the voluntary agreement of the members, the members themselves not being the parties complaining thereof.

(5.) As between such association and person not a member thereof, the sending by such association to its members, upon ascertaining that plaintiff a non-member of the association was officing with a member, of circulars to all of its members announcing plaintiff's non-membership and calling attention to its rules is not an unlawful or coercive act.

(6.) The sending to the insurance company represented by plaintiff as agent, a notice by mail, from such association that plaintiff was not a member of the association is not an unlawful or coercive act.

(7.) Such an association does not fall within the inhibitory provisions of the anti-trust law, 93 O. L., 143, entitled "An act to define trusts and to provide for criminal penalties and civil damages and punishment of corporations, persons, firms and associations or persons connected with them, and to promote free competition in commerce and all classes of business," as insurance was not contemplated by the legislature in passing such act.

(8.) Where an act is borrowed and copied by the legislature of this state from a similar act of another state after it has been construed by the highest judicial tribunal of that state, such construction will be adopted by the court of this state.

(9.) Plaintiff, not a member of such an association, cannot proceed for such injunction or damages under section 3695, Revised Statutes, providing certain penalties upon foreign insurance companies for entering into compacts with other insurance companies or agents for the purpose of governing or controlling the rates charged for fire insurance on any property within the state.

DEMPSEY, J.

The petition of the plaintiff filed in this case alleges that the said plaintiff is engaged in the business of an insurance agent in the county of Hamilton and state of Ohio, and has been so engaged for many years; that he has built up and now has a large and profitable business as such agent; that a large part of his business is done with and through other persons engaged in the insurance business as agents, brokers and solicitors in said county; that the defendants are all engaged in the insurance business in said county; that they have been, and are now, federated together with many other persons and corporations (many of whom are unknown to plaintiff), likewise engaged in the insurance business, in an illegal association, unincorporated, known as the Cincinnati Underwriters' Association, for the purpose of deciding rates of insurance, regulating and controlling the business of its various members, and preventing them from doing insurance business with other insurance agents, brokers and solicitors in said county, who are not members of said association, and for the purpose of driving such other agents, brokers and solicitors out of business in said county; that many of the firms and individual members of said association are local representatives and agents of foreign insurance companies, licensed to do business in Ohio; that these foreign insurance companies, while not nominally members of said association, are so in fact; that for accomplishing its purposes, said association has an organization consisting of a president, a vice-president, a secretary, and various committees, and that it has adopted a large number of rules in furtherance of its purposes; that one of these rules reads as follows: "No member of this association shall place any risks for, or assist, directly or indirectly, in giving any risks to or receive any risks within the jurisdiction of this association, from any person not a member of this association"; that the phrase "jurisdiction means" the territory of Hamilton county, Ohio; that, to make this rule effective, the association has another rule subjecting a member who violates the first rule to a fine of $50.00 for the first offense, and $100.00 for each subsequent offense; that it is the duty of a certain committee to discover violations of rules, and to put in motion steps to punish same; that all members may be required to be examined under oath as to violations of said rules; that another rule of said association reads as follows: "No member shall have desk room or office in the same room or suite of rooms, or in rooms adjoining and communicating with an insurance agent or company, who is not a member of this association. Members now having such arrangements shall be notified to bring themselves in harmony with this rule within thirty days, or be subject to charges and penalties"; that the plaintiff is not a member of said association; that the defendants, in conjunction with many other members of said association, whose

names are not all known to the plaintiff, are endeavoring to enforce the rules of said association against the plaintiff, and are threatening to fine and expel members who do business with him; that he has existing contracts with various members of said association for the exchange of business; that he also has a lease, made with a member of said association, for the use of an office adjoining the office of said member; that these members of said association with whom he has contractual rights and obligations, are threatened with fines and expulsion from said association, unless they break their said contracts, and that he has received notice from said members, that under penalty of fines and expulsion from said association, and loss of business, they will be compelled to break their contracts with him; that the defendants herein, under the guise of said association, are, and have been, engaged in a malicious attempt to injure the plaintiff and have already greatly damaged his business, and put him to great expense and loss to his damage in the sum of $1,000.00; that many members of said association desire to, and will, do business with him of a profitable nature to him if not restrained and intimidated by the defendants; that defendants have been requested by the plaintiff to cease their threats and other unlawful acts, but they decline to do so, and assert their intention to fine and expel members of said association who transact insurance business with him, and they will do so to plaintiff's irreparable injury unless restrained by the court; and that said association is simply a disguise by and under which certain foreign insurance companies licensed to do business in Ohio, combine together for the purpose of regulating and controlling rates, and that the defendants, together with many others, are in a conspiracy for this purpose. Plaintiff then prays for a judgment against said defendants in the sum of $1,000.00, and that they each and all be restrained (1) from taking any measure or means to compel any member of said association to break his contract with plaintiff, and (2) from prying into the business done between him and members of said association, and (3) from enforcing any fine, penalty, or other punishment, against any person doing business with him, and (4) from confederating together, and with other persons or companies, for such purpose and for the purpose of preventing, directly or indirectly, any person from transacting business with him, and (5) from in any way interfering with his business relations with any persons; and, then, he prays for all other and proper relief and for his costs. The defendants answer denying that they have been or are federated together with any other persons or corporations in any illegal association for the purposes in the petition alleged or any purpose whatever; that any foreign insurance company is a member of the defendants' association; that said association is organized for the purposes in the petition alleged; that they singly, or together, or in conjunction with others, are endeavoring to enforce the rules of said association against the plaintiff or are threatening to fine and expel members who do business with him; that members of said association with whom he has contractual rights and obligations are threatened with fines and expulsion from said association unless they break their said alleged contract, and that he has received notice from such members that under penalties of fines and expulsion from said association and loss of business, they will be compelled to break their contracts with him; that they are, or have been engaged in an attempt, malicious or otherwise to injure the plaintiff, or that they have damaged his business or put him to expense and loss in the sum of $1,000.00 or any other sum; that many members of said association desire to or would do business with plaintiff, or are restrained or intimidated by defendants; that defendants, or any of them, have been requested by plaintiff to cease their threats or other alleged unlawful acts, but declined to do so and assert their intention to fine and expel all members of said association who transact insurance business with him, or to enforce any rules of said association against plaintiff, or that they intend to enforce any rules of the association against him; that said association is in any sense a disguise by and under which certain foreign insurance companies licensed to do business in Ohio, combine together for the purpose of regulating and controlling rates, or is a disguise for any other purpose; and, finally, that they are in a conspiracy among themselves or with others for any purpose whatsoever. The answer specifically admits that the association is officered and organized as set forth in the petition; avers that its true purpose for which alone it is maintained, is "the promotion of harmony and correct practice, and generally the improvement and elevation of the business of fire and tornado insurance"; and alleges want of information as to the truth of the petitioner's statement that plaintiff has existing contracts with various members of said association for exchange of business, or that he has

a lease made with a member of said association for the use of an office room adjoining the office of said member, and, therefore, denies this admission. Neither denial, nor specific admission, is made of the averments of plaintiff's petition in regard to his occupation, the length of time he has been engaged in it, the extent and character of his business, the manner in which said business is in large part done, and the nature of defendants' occupations. Nor, again, is there any denial or specific admission made of the existence of the rule set forth in the petition as to the placing of risks for, or the giving to, or receiving the same from, non members within the "jurisdiction" of the association, nor of the rule assessing penalties for the violation of the rule as to risks, nor of the duty of a certain committee to discover violations of rules, and to put in motion steps to punish the same, nor of the compulsory examination under oath as to violations of rules, nor of the rule with regard to officing with a non-member, nor of the averment that plaintiff is not a member of said association.

So that for the purposes of this case, these various averments of the petition are to be taken as true.

The remaining issues of fact to be determined by the court are easily resolved into three groups.

The first and most important group is that arising out of the organization of the association itself, and its subsequent actions in the conduct of its business. Under this group of issues, four questions are to be answered; 1. What was the real purpose and object of this association? 2. How were such purpose and object sought to be accomplished by the association? 3. In this case and so far as the plaintiff is concerned, what steps, if any, were taken or threatened to be taken, to accomplish the purpose and object of said association? And, 4, If any such steps were taken or threatened to be taken, what effect, if any, did they have, or would they have, upon the rights of the plaintiff herein? The second group of issues may be included in the question, What acts, if any, malicious in their nature, have been done or attempted to be done, by the defendants to the injury of plaintiff or damage to his business?

The last group of issues is founded on section 3659 Revised Statutes and is raised by the question, "Who in reality constitute this association, the licensed foreign insurance companies, or the agents, and, in either event, what is the effect of said section?" Taking up the first group of issues, it seems to me from

the evidence that the question, "What was the real purpose and object of defendants' association?" is rightfully answered by the plaintiff when he says, in his brief, that its one great object was to fix and maintain insurance rates and to prevent competition. How was this object accomplished or sought to be accomplished? By the articles of association the members obligated themselves to faithfully observe the constitution and by-laws of the association.

By such constitution and by-laws the secretary of the association fixed the rate of insurance for the various kinds of risks, which rate was to be uniform to all the members and observed by them. In addition was the rule set forth in the petition providing for business non-intercourse with non-members; and both rules were enforced by graduated penalties culminating finally in expulsion for violations of a certain prescribed repetition or degree.

The practical operation of these rules produced the result of fixed rates and non-competition in this way. It is assumed that all the members of the association faithfully observe all the rules, especially as to rates and non-intercourse with outsiders. Now, it is not customary with insurance companies to take the entire amount of large risks offered by customers, but, instead, to divide the risk with other companies, very often a very large risk being split up among a great many companies.

Now, take a non-association agent, having a risk of this kind, and as a practical matter he would find it impossible to place all of it, outside of association members, and, per consequence, he must lose the business, or join the association with its rates and its rules. So, also, as to association agents having like risks; under the rules of the association, they would not be permitted to divide any part of these with plaintiff, thus depriving him of possible profits in that direction. But the consequences are further reaching than even this, for being unable either to give or receive in exchange business of the nature described, his availability as an agent would be severely impaired, and companies would either be chary of employing him, or dispense with him altogether. As a consequence, he would be driven either to give up the business, or join the association with its rates and its rules.

So far as the plaintiff herein is concerned, what steps were taken, or threatened to be taken, involving the objects of this association, and what effect did they have, or would they probably have, upon him and his business? The plaintiff is an insurance agent, carrying

on an insurance business of some extent, but representing only one company. It is necessary for him to exchange business with other agents. He testifies that a number of other agents, members of the defendants' association, have been and are exchanging business with him, and are willing to do so in the future if unmolested by defendants; but on cross-examination, it appears that the only association members he can call to mind, willing to do business with him, as against the association rules, are his two brothers, one doing business singly, and one as a member of a firm. At or about the time of bringing this suit, the plaintiff had office relations, or connecting offices, 'with one of his said brothers, under a lease or renting arrangement with his brother. The defendants, through their secretary, sent bulletins to all the members of the association calling attention to the plaintiff's not being a member of the association, and to the non-intercourse rule. Thereupon plaintiff was notified by his brother, with whom he had office relations, that his firm would have to cease doing business with plaintiff and that plaintiff would have to find another office. Neither of the brothers was called to testify, as to the transactions in which they were involved, nor was any other member of defendants' association called to show their willingness to do business with plaintiff. These facts depend alone upon the plaintiff's evidence to which, for the purposes of this phrase of the case, I am willing to give its full probative force. There is no evidence at all to show that, by these acts of the defendants' secretary, and the consequences thereof, plaintiff suffered any actual damage in the loss of any business by reason of failure to place the same and the like, or that he was deprived of his company, or that there was danger to him of losing his company. There was evidence on the part of plaintiff's counsel that the association's secretary had announced to him the purpose of the association to enforce all of its rules, the practical effect of which would be that all members would be prevented from doing business with plaintiff under pain of fines and expulsion, and there was evidence that expulsion in other cases had been followed by a loss of companies, from which it was inferred that other expulsions would result in loss to the expelled members of their companies also. On the second branch of the case, involving malicious acts, there was evidence, let in by me for the purpose of showing an ulterior object in the operation of this association, tending to show the solicitation had been made of insur-

ance agents other than the plaintiff to join this association, and that, on failure to respond, pressure had been brought upon the companies represented by such agents to dismiss them, and that in some cases the agent had been dismissed. There was also evidence tending to show that, agents having been expelled from the association, the secretary notified their companies, and thereupon said companies dispensed with such agents, the inference being that it was done at the instigation or suggestion of said secretary acting for the association. And there is also evidence that the secretary communicated to plaintiff's company the fact of his not being a member of the association but there is no evidence that he went beyond the statement of that fact, or that any consequence flowed thereon affecting or threatening to affect the plaintiff. As to the third branch of the case, my view of the statute in controversy, renders immaterial any finding as to the actual facts of this case on that issue.

The first contention of the plaintiff is that this association is a conspiracy at the common law, injuriously affecting him in his business relations, and that under the facts of this case, he is entitled to a remedy both at law and in equity against these defendants. He bases this contention on two grounds, the first being that the ultimate and final object of the association is to place restrictions upon business competition, and thus permanently fix rates, which object he declares is in absolute contravention of law. His second ground is that the means whereby the ultimate object is accomplished viz: by the obligation of the members, enforced by stipulated penalties, not to transact business with non-members are also in contravention of law.

A conspiracy is a combination between two or more persons to do an unlawful act or to do a lawful act by unlawful means. To maintain an action for conspiracy, whether at law or in equity, it must appear, always assuming that there must be injury to the plaintiff done or reasonably apprehended, that the object relied on as the basis of the conspiracy, i. e., the thing to be done, or the means adopted for its accomplishment, were unlawful. Bohn Manufacturing Co., v. Hollis, 54 Minn., 223. Macauley Bros. v. Lierncy, 19 R. I., 255. Now, tested by the foregoing principles, let us examine the claims of the plaintiff herein. And in the examination of this branch of the case, it may be well to say that no account is taken of ulterior motives, arising from malice, evil intent or malevolent feelings, as reflecting upon the characterization, as lawful or un-

lawful, of the object sought to be accomplished or of the means by which it is effected. Much of the difficulty experienced in ascertaining truly the right rules of law applicable to this case has been occasioned by the confounding of cases depending upon trade restrictions alone where the element of malice has also been interwoven into the facts and treated as a material factor. How far an act lawful in itself may be transformed into an unlawful act because of the malice, bad motive, or evil intent which prompted it or accompanied it, is a question not quite put at rest by the decisions in this country.

The great case of Allen v. Flood, L. R. App. Cas. (1898) 1, settled the doctrine in England that "the existence of a bad motive, in the case of an act which is not in itself illegal, will not convert that act into a civil wrong for which reparation is due." If to the principle enunciated in that case there be conjoined that other principle contended for by many able courts that what one may lawfully do, two or more may lawfully combine to do, the soundness of some American decisions enforcing a liability for conspiracy under certain circumstances may well be doubted. The following line of cases, cited by plaintiff, as sustaining his contention of a conspiracy in this case, and having in some instances very slight, and in other instances, notably the last three cases, very marked resemblances to the case at bar, are all, in reality, when critically examined, based upon this idea of acts maliciously done to the plaintiffs, and not upon the theory that the acts themselves were originally positively illegal: Moore v. Bricklayer's Union, 23 W. L .B., 48; Printing Co. v. Howell, 26 Oregon, 527; Vegelahn v. Guntner, 167 Mass., 92; Walker v. Cronin, 107 Mass.. 555; Carew v. Rutherford, 106 Mass.. 310; Robinson v. Pine Land Ass'n, 40 S. W. (Tex.) : Deltz v. Winfree, 80 Texas, 400; Davis v. The Engineres, 28 Ap. Div. N. Y., 396; Insurance Co. v. Fire Underwriters, 67 Fed., 310; Ertz v. Produce Exchange, 81 N. W. (Minn.) 737; Boutwell v. Marr, 42 Atl. (Vt.), 607; Jackson v. Stanfield, 137 Ind., 592.

In Commonwealth v. Shaw, 45 Mass., 111, Chief Justice Shaw laid down the rule that "an association, the object of which is to adopt measures that have a tendency to impoverish a person—that is, to diminish his gains and profits—is lawful or unlawful as the means by which the object to be effected are lawful or unlawful."

In the course of the opinion he goes on to say that the association in question had as its purpose the inducing of all of like occupation to become members, and that such a purpose was not unlawful; but should the purposes of the society, in their inception innocent, be preverted by those in control to purposes of oppression or injustice, then the purposes would become unlawful.

And it is on this question of "perversion" that most of the cases turn, Judge Taft, in Moore v. Bricklayer's Union, supra, says that such perversion occurs when the members of the association "use such indirect means as obscure their original intent and make their combination one merely *malicious to* oppress and injure individuals." This gives rise to the next query, and that is what is the legal test of "malicious." Does the mere intent to injure a person make an act malicious? Every person is presumed to intend the natural and probable consequences of his own acts. Now, a business man has the right to lower the price of his goods; he knows the effect of that reduction will injure his competitor, probably force him out of business. Yet if he does lower the price of his goods, is he liable to the competitor for the losses sustained by him in consequence? Much thought has been devoted by the courts to a true solution of the question involved herein, and many tests have been suggested, none of which, however, seem to have met with universal approval. Cooke in his book on "Trade Combinations" has examined the subject with some care, and he declares that nothing but confusion and uncertainty result from bringing into consideration so subtle an element as the intent with which an act was done, and that in reality there is no necessity for it. (Section 2, pp. 5 and 6.) And he concludes that, in determining whether a right of action arises from an act producing injury, attention should be directed, not at all to the intent with which the act was done, but to the existing relation, if any ,of the party doing the injury to the conditions out of which arose the act. And then he formulates this rule: "The test of liability is whether the act was the natural incident or outgrowth of some existing lawful relation." And he examines in the notes the most prominent of the cases hereinbefore cited. Malicious acts, he defines, as "acts done with malice, or with intent to do injury, in the absence of any existing lawful relation of which the act is a natural incident or outgrowth." And then extending his consideration of the subject to persons occupying the relation of competitors in trade, he finally reaches this conclusion that the

existence of the relation of trade competitor justifies acts that are the natural incident and outgrowth of such relation, whether or not done with the direct intent to injure one's rival.

In Allen v. Flood, supra, L. J. Esher's definition had been severely critized; his definition was that an act was malicious when done with "the indirect purpose of injuring another, or of benefiting one's self at the expense of the other"; and this is practically Judge Taft's definition in Moores v. Bricklayer's Union, based on Bowen v. Hall, L. R., 62 B., 333, and Walker v. Cronin, 107 Mass., 555. Even in this country there has been dissent offered to these definitions as universally safe tests, as also to the truth of the proposition often asserted, that a combination of persons to do what any one of them lawfully might do by himself, will make the otherwise lawful conduct unlawful. See Judge Holmes' dissenting opinion in Vegelahn v. Guntner, 167 Mass., 92, and Cooke on Trade Combinations at pp. 16 and 17, citing Bohn Manf. Co. v. Hollis, 54 Minn., 223. Most of the cases relied on by Cooke in his notes have been cited in this case, and as I have had occasion to examine them myself in connection with this case, I have been constrained to accept his conclusions and principles deduced from them as the best applicable under the circumstances.,

Of course, there is some uncertainty as to what will constitute "a natural incident or outgrowth' 'of any given relation, although in the case at bar it did not seem difficult to draw the lines. Once established that the act complained of is a natural incident or outgrowth of any particular relation, then the intent with which that act is done is wholly immaterial, as is also the question whether the act was done singly or in combination. Hence, I say, and I trust that I have made myself clear, that the question of malice and intent have no place in this case as affecting the operations of the defendants as I have found them to be herein, and this opinion is based entirely on their elimination from the case. This brings us back to the original question.

Was the main object of the defendants' association, viz: the fixing and maintenance of insurance rates, thereby restricting competition, illegal at the common law? Plaintiff says it was, and cites an array of cases which he claims sustain his view.

An examination of these cases shows that they all with two exceptions, which will be noted hereafter, arose between parties to contracts or articles in the nature of contracts, and that the decisions turn not upon the inherent legal nature of the contracts as defined or described by the courts, but rather upon the effects or consequences of such contracts if upheld, and the policy to be pursued by the courts as to enforcing them. And the uniform rule has been to refuse any relief based upon them as being contrary to public policy. The contracts were stigmatized not as illegal, not as something forbidden, but as void, as something which the parties might or might not observe as they pleased, but as to which, in the event that one choose not to observe them, the court would extend no aid in compelling observance.

I do not intend to examine these cases as to all their details, but shall content myself with a synopsis of the question involved in each. Mallan v. May, 11 M. & W., 653, was a suit between two dentists based upon a contract between themselves. Rahenstraw v. Lanier, 30 N. E., (Ga.) 735, involved a contract between two physicians, regulating their spheres of practice. One sought an injunction, and it was denied, because the agreement was in restraint of trade. More v. Bennett, 104 Ill., 69, involved the rules and regulations of a stenographers' association, of which plaintiff and defendant, both, were members.

These rules prescribed a fixed rate of fees for services. Plaintiff had procured a contract for certain services in a trial at the prescribed rate. Defendant offered, for other work at the same trial, to cut the rate fixed by the association, and plaintiff, in order to secure all the work, was compelled to meet the cut. Thereupon he sued the defendant for the difference between his agreed rate and the association fixed rate, basing his claim upon the association rules and regulations as a contract between the parties. It was held that he was not entitled to recover, because the association's rules and regulations constituted a contract in restraint of trade and against public policy. Railroad Co. v. Telegraph Cable Co., 26 Sou., 370, and Railroad Co. v. Telegraph Co., 173 Ill., 508, were cases both involving contracts between the respective railroad companies and telegraph companies whereby exclusive use of the railroad's rights of way was granted to the telegraph companies, and such contracts as between the parties were held void and non-enforceable. Metzger v. Cleveland, 8 Ins. L. J., 176, was a suit between agents, parties to an underwriter's agreement, for violations of that agreement, and it was held that the action was not maintainable. At page 181 of the report, the court

says that "parties to agreements of this kind may voluntarily execute them themselves, if they see proper. Lawyers and physicians may establish and maintain uniform prices in fee bills on the same principle, but courts will not enforce them." Morris Run Coal Co. v. Barclay Coal Co., 68 Pa. St., 173, arose out of transactions under a contract for a coal combine to which plaintiff and defendant were parties, and it was held that plaintiff could not recover.

The Ohio cases cited, Salt Company v. Guthrie, 35 O. St., 666, Emery v. Candle Co., 47 O. St., 320, and Cordage Co. v. Cordage Co., were all of like nature, being actions between the parties to the contracts. Beechly v. Mulville, 102 Iowa, 602, was a case peculiar in this that it was a suit by an insurance agent to recover damages from such a combination as defendants herein for conspiracy to break up his business, and the suit was held maintainable under the Iowa anti-trust act as interpreted by the supreme court of that state in that very case, and yet notwithstanding that interpretation the court held that the plaintiff himself being a party to the combination could not recover damages against the others for enforcing against him the rules, because it would be against public policy to allow him to do so.

Bailey v. Master Plumbers, 52, S. W. (Tenn.), 835, was a case where Bailey, a plumber, was sued by his own association to recover a sum in the nature of a penalty, stipulated for in the rules, because he did certain work in competition with another member, and the court held the stipulation could not be enforced. Huston v. Reutlinger, 91 Ky., 333, was a case decided practically upon its own peculiar facts, and without any reference to the principles involving conspiracy or contracts in restraint of trade.

An organization of underwriters was effected in 1854; its constitution as then framed was in existence at the date of the beginning of the suit. In August, 1888, *over the protest of plaintiff,* objectionable by-laws were framed and passed, prescribing certain penalties, among them expulsion, for non-observance of requirements. Plaintiff became subject to the penalty of expulsion, and he sought an injunction which was allowed, and affirmed by the Court of Appeals, the ground being that these *new by-laws* were against public policy, were a departure from the objects of association, and were unjust and unreasonable, and, in such a case, the chancellor will not hesitate, when called upon, to protect the parties in

their rights as members, especially when expulsion affects their financial standing and deprives them of property that is common to all. United States v. Addyston Pipe Co., 54 U. S. App., was decided under the act of Congress of July 2, 1890, and so much of the decision as is applicable to the case at bar is clearly opposed to plaintiff's contention, for it lays down the rule that at common law contracts that were even in unreasonable restraint of trade were not unlawful in the sense of being criminal or giving rise to a civil action for damages in favor of any one prejudically affected thereby, but were simply void and were not enforced by the courts. Nor is The State v. The Buckeye Pipe Line Co., 61 O. St., 520, very helpful to plaintiff's contention. This was an action in Quo Warranto, for violations of the Ohio anti-trust act, 93 O. L., 143, to be noted hereafter, and one of the contentions on behalf of the state was that the act was merely declaratory of the common law. The court after saying that one answer to this contention was that the act created crimes and offenses, and there were no common law crimes in Ohio, continued, "furthermore, it is quite clear that as to some of the persons and contracts within the operation of the act its purpose is to authorize proceedings against parties who are performing the terms of the forbidden contracts, while without the aid of the statute courts can denounce the contracts as unlawful only when by actions against defaulting parties they are called upon to aid in their enforcement." The suggestion of the court that there are within the ban of this statute some contracts, that could at common law, be denounced as unlawful only when the parties themselves in some way presented the contract itself for adjudication, implies that at common law there might have been other contracts, or compacts in the nature of contracts, which could have been denounced as unlawful without the interference of the parties themselves. And this leads us into inquiry as to what was the common law pertaining to this whole subject. Cooke in his book on "Trade Combinations" touches upon this matter, and divides the subject into monopolies, restrictions upon competition, (being combinations which tend to monopolies,) and simple contracts in restraint of trade. A contract in restraint of trade at the common law, he defines as any agreement whereby any person bound himself not to exercise his trade or calling, without reference to the character of any limitation as to time or space. Afterwards limitations as to time or space were required in order to

[COPYRIGHT. 1901, BY CARL G. JAHN.]

render the agreement enforcible, and latterly these tests were abandoned for the doctrine of reasonableness.

A monopoly was the absorption of one individual or set of individuals of a right possessed by the community at large, and to a certain extent included the common law offenses of forestalling, regrating and engrossing; while combinations restrictive of competition were agreements between parties to fix maintain and depress or raise prices. The line of demarcation between monopolies, as now understood, and combinations restrictive of competition is not very well defined, although the distinction is recognized, and the latter combinations have, prior to the passage of the anti-trust statutes, been upheld when tested by rules with regard to their reasonableness in analogy to the rules regulating contracts in restraint of trade. For an interesting discussion of this topic see Insurance Co. v. The State, 86 Tex., 250, at page 268 et seq. That combinations restrictive of competition, as defined herein, and of which the case at bar is a sample are not illegal in themselves, is settled by many cases, the most notable of them being the case of The Mogul Steamship Co. v. McGregor, L. R. App. cases,1892, 25, affirming the same case in L. R., 232 B. D., 598; 21 Id., 544; 15 Id., 476, and the case of the United States v. The Addyston Pipe and Steel Co., 54 U. S. App., 723, in both cases it being settled that whatever might be the fate of the parties in a controversy *inter se,* no outsider can plead the illegality of such a contract whilst the parties themselves are willing to act and continue to act upon it.                ,

The same principle has been adopted in Bohn Manufacturing Co. v. Hollis, 54 Minn., 223, where it was laid down that "no case can be found in which it was ever held that at common law, a contract or agreement in general restraint of trade," (and the facts of the case make it a case of restrictions upon competition,) "was actionable at the instance of third parties or could constitute the foundation of such an action. The courts sometimes call such contracts 'unlawful' or 'illegal,' but in every instance it will be found that these terms were used in the sense merely, of 'void' or 'unenforceable' as between the parties, the law considering the disadvantage so implied upon the contract a sufficient protection to the public." And, likewise, in Brewster v. Miller et al, 41 S. W. (Ky.), 301, which was a case involving a funeral directors' association, it was held that although this association was formed for the purpose of controlling or fix-

ing prices, and consequently fell under the prohibitions of their statutes, yet no right of action against the association arose to any one because it had refused to sell merchandise and property to him. The same doctrine was sustained in Macauley Bros. v. Tierney, 19 R. I., 255. So that it is practically settled law now that, in the absence of prohibitory statutes, a combination or compact for the simple purpose of controlling prices and thus restricting competition, is not of such illegality as will confer a right of action upon those injuriously affected by it. A careful reading of the three cases hereinbefore mentioned, (Boutwell v. Marr, Ertz v. Produce, and Jackson v. Stanfield) will show that they do not in reality militate against this conclusion, for the decisions in those cases are put expressly, one might say, upon the ground of malicious acts, although one might also safely doubt, in view of what has been heretofore said as to the effect of malice or evil intent upon the legal character and consequences of acts otherwise lawful, whether those decisions are quite sound.

In Boutwell v. Marr, the court held that the real object of the association was to kill the polishing business of plaintiffs in order to compel them to join defendants' association. No authorities are cited to justify the conclusion of the court. In Ertz v. Produce Exchange, the previous case of Bohn Manufacturing Co. v. Hollis was approved, but the decision was placed upon the ground that in the Ertz case the defendants were not seeking to protect or subserve any legitimate interests of their own. And in Jackson v. Stanfield, where the combination was of retailers in lumber affecting the actions of wholesalers, to the detriment of the plaintiff, a broker, the court said that the action of the wholesalers was not a voluntary affair of their own; the association was not even a combination of wholesalers, but was one of retailers to restrict the liberty of the wholesalers to sell to consumers and brokers, and that the wholesalers must either obey or lose their trade. And, so as to the second contention made by plaintiff that the means whereby the ultimate end of this association is effected, viz., the mutual obligations of the members, enforced by penalties not to do business with outsiders, are unlawful, the law on the authorities, seems to be settled the other way. In every case named in the following list of decisions, the question, in some shape, has been considered, and the right either conceded or declared to exist that one has a right to decline to con-

tract, to deal, or to do business with another, no matter what the motives impelling the declination may be, and that whatever one may decline lawfully to do singly, two or more may jointly agree not to do. Some of the cases, as Jackson v. Stanfield, and Ertz v. Produce Exchange, supra, inject the condition that there must be no element of malice, and others as Steamfitters' Association v. Cumming, 65 N. Y. S., 946, require that the declination must be a willing one and not coerced. But neither malice nor coercion appear in the case at bar, for the assessment of penalties cannot be declared coercion where the same have been assumed by voluntary agreement of penalties cannot be declared coercion where the same have been assumed by voluntary agreement, and no proof has been adduced that any of the members of the association are complaining on that score. The cases referred to are as follows:

The Mogul Steamship Co. v. McGregor, supra, the leading case in England, decided by House of Lords in 1892.

The Commonwealth v. Hunt, 45 Mass., 111, the leading case in America, decided in 1845. Hunt v. Symonds, 19 Mo., 583, (1854) ; Carew v. Rutherford, 106 Mass., 1 (1870) ; Bowen v. Mathieson, 96 Mass., 499 (1867) ; Walker v. Cronin, 107 Mass., 555 (1871) ; Payne v. R. R. Co., 81 Tenn., 507 (1884) ; Bohn Manuf. Co., v. Hollis, 54 Minn. 223 (1893) ; Jackson v. Stanfield, 137 Ind., 592 (1894) ; Buchanan v. Kerr, 159 Pa. St., 433 (1894) ;Macauley v. Tierney, 19 R. I., 255 (1895) ; Ins. Co. v. Fire Underwriters, 67 Fed., 310 (1895) ; Brewster v. Miller, 41 S. W., 301 (1897) ; Robinson v. Pine Land Association, 40 S. W., (1897) ; Reform Club v. Laborers U. P. Soc'y, 60 N. Y. S., 388 (1899) ; Master Builders' Association v. Damascio, 63 Pac., 782 (1900) ; Steamfitters' Association v. Cumming, 65 N. Y. S., 946.

Two minor points bearing upon this phase of the case remain to be considered. One is that after the defendants' secretary had ascertained that plaintiff was officing with a member of the association, he sent out circulars to all the members, announcing plaintiff's non-membership, and calling attention to the rules. This is claimed to be unlawful as savoring of coercion or persecution. Bohn Manufacturing Co. v. Hollis, supra, is express authority for the rule that the sending of such notices to members is not an unlawful act, and a careful reading of Jackson v. Stanfield, supra, cited by plaintiffs herein, will show that even the Indiana court concedes the legality of such measures. It is also claimed that it was

unlawful and coercive for the secretary to mail to plaintiff's company, notice that he was not an association agent. Macauley Bros. v. Tierney, 19 R. I., 255, is direct authority for the rule that the sending of such a notice is not unlawful. This I think, disposes of all questions raised in the case as to the aspect in which defendants' association, under the evidence herein, would be viewed at the common law ; and the conclusion is satisfactory to my mind that the defendants' combination is not a conspiracy, in that it is not, either in the end aimed at by it, or in the means used to accomplish that end, unlawful in the sense of positive, affirmative illegality, so as to justify any person outside of said combination in predicating a liability to him for the operations thereof. The status of the combination between the members themselves is not before the court, and is not passed upon. During the course of the preparation of this opinion, my attention has been called to a late work on the law of this subject, "Eddy on Combinations," issued the first of this year. I have made an examination, cursorily it is true, to see whether or not there has been any change in the trend of the cases as the law on the subject developed, but was not able to find anything that indicated any reversal of opinion on the part of the courts.

The second general contention on the part of the plaintiff is that the combination proven and admitted in this case falls within the provisions of the act of the General Assembly, passed April 19, 1898, popularly known as the Stewart-Valentine anti-trust law, and now numbered as sections 4427-1 to 4427-12 of Bates' annotated statutes of 1900. This act is to be found in the session laws in volume 93, at page 143 ,and is entitled "An act to define trusts and to provide for criminal penalties and civil damages, and punishment of corporations, persons, firms and associations, or persons connected with them, and to promote free competition in commerce and all classes of business.

By section 1, it is provided "That a trust is a combination of capital, skill or acts by two or more persons, firms, partnerships, corporations or associations of persons, or of any two or more of them for either, any or all of the following purposes:

1. To create or carry out restrictions in trade or commerce. 2. To limit or reduce the production, or increase, or reduce the price of merchandise or any commodity. 3. To prevent competition in manufacturing, making, transportation, sale or purchase of merchandise, produce or any commodity. 4. To fix

at any standard or figure, whereby its price to the public or consumer shall be in any manner controlled or established, any article or commodity of merchandise, produce or commerce intended for sale, barter use or consumption in this state.   5.  To make or enter into or execute or carry out any contracts, obligations or agreements of any kind or description by which they shall bind or have bound themselves not to sell, dispose of, or transport any article or any commodity or any article of trade, use, merchandise, commerce or consumption below a common standard figure or fixed value, or by which they shall agree in any manner to keep the price of such article, commodity or transportation at a fixed or graduated figure, or by which they shall in any manner establish or settle the price of any article, commodity or transportation between them or themselves and others, so as to directly or indirectly preclude a free and unrestricted competition among themselves, or any purchaser or consumers in the sale or transportation of any. such article or commodity, or by which they shall agree to pool, combine or directly or indirectly unite any interests that they may have connected with the sale or transportation of any such article or commodity, that its price might in any manner be affected.   Every such trust as is defined herein is declared to be unlawful, against public policy, and void."

Sections 2 and 3 provide for a remedy against corporations, and the duties of the Attorney General.

Sections 4, 5, 6 and 7 relate to the criminal phase of the statutory provisions. indictment, evidence and penalty.   Sections 8, 9 and 10 have reference to miscellaneous matters.   Section 11 provides that "in addition to the criminal and civil penalties herein provided, any person who shall be injured in his business or property by any other person or corporation or association or partnership; by reason of anything forbidden or declared to be unlawful by this act, may sue therefor in any court having jurisdiction thereof in the county where the defendant resides or is found, or any agent resides or is found, or where service may be found without respect to the amount in controversy, and to recover two-fold the damages by him sustained and the costs of suit. Whenever it shall appear to the court before which any proceedings under this act may be pending, that the ends of justice require that other parties shall be brought before the court, the court may cause them to be made parties defendant and summoned, whether they reside in the county where

such action is pending or not." The plaintiff's claim is that the defendants' association is a combination to carry out restrictions in trade or commerce within the first subdivision of section 1, and that insurance is a "commodity" within the other subdivisions.

The petition herein, it will be observed, seeks damages as well as an injunction; this fact makes section 11 operative, if the business of insurance be covered by the statute, although it may well be doubted, taking the statute as a whole, in view of all its penalties and punishments, whether injunctive relief by civil action at the suit of private individuals, is at all contemplated by the statute. It is not necessary, however, now to pass upon this question.

Legislation if this nature in this country, it appears, first took place in the state of Texas.

By an act of the legislature of that state, passed March 21, 1889, provisions were made against trusts, and penalities prescribed. The Ohio act is almost a literal transcript, so far as the body of the act is concerned, of the Texas statute.   The Texas act is entitled "An act to define trusts, and to providefor punishments and penalties of corporations, persons, firms and association of persons connected with them, and to promote free competition in the State of Texas." The title of the Ohio act differs somewhat in phraseology and grammatical construction from the title of the Texas law, and it is very evident that there are some inaccuracies, typographical perhaps, in the Ohio act, but the last clause in the Texas title has in the Ohio title been amplified into "to promote free competition *in commerce and all classes of business*."   In the body of the Ohio act there are also some additions to the language of the Texas act.   Thus subdivision 1, of section 1, in the Texas act reads:   First, to create or carry out restrictions in trade."   In the Ohio act it is: "1 To create or carry out restrictions in trade *or commerce*."

In subdivision 4, of the Ohio act, the words "or consume" and "barter" are interpolations on the Texas act.   And in various other places the Ohio statute uses the singular number of terms expressed by the Texas statute in the plural.   But in the main both statutes are practically identical.   The Texas statute came under review in the case of Insurance Co. v. The State, 86 Texas, 250, on the very questions involved here, and an exhaustive examination was made by the court as to the probable intent of the legislature, viewboth under the Texas criminal code and the general common law, in the use of the terms,

"restraint of trade," "commerce" and "commodity." The opinion is an exceedingly instructive one on this point, but all I can give here in the conclusions the court reached on these points. Thus, as to the word "trade" the court held that it was not the purpose of the legislature to give to that word so comprehensive a meaning as would subject all parties to contracts in ordinary restraint of trade, as these terms are understood at common law, to such heavy penalties, and concluded that the word must be construed as synonymous with "traffic," limiting it to the buying and selling of articles of commerce, the barter of such articles, and their transportation by common carriers, and that it, therefore, did not embrace the business of insurance, which is trade only in the sense that it is an occupation or employment.

As to "commerce" the court says, relying on Paul v. Virginia, 8 Wallace, 168, that is only by a strained construction that the word "commerce" can be made to embrace the business of insurance; and to say that insurance is an article of commerce is a construction still more strained. Insurance is *an aid* to commerce, but not commerce itself; nor is it an article of commerce. As to "commodity," the court notes the various meanings given thereto by the lexicographers, and then declares that the word is ordinarily used in the commercial senses of any movable and tangible thing that is ordinarily produced or used as the subject of barter or sale; and the court proceeds to show that this interpretation is justified by the context, when careful analysis is made of the category of offenses implied in the second, third, fourth and fifth subdivisions of section 1, defining a trust. The court then argues as to the correctness of all its interpretations by a reference to the accepted popular meaning of "trusts" when the statute was passed, and the businesses that they were then involving, and instances a number of them.

The court, finally, concludes its discussion by the statement that the obscurity of meaning in section 1, is due to the fact that that "section in tautology, and its general structure is such that rules based upon grammatical niceties should not prevail over broader and more liberal rules of construction." I might say that the emendations made in the Ohio statute have not clarified its meaning any. In The Aetna Insurance Co. v. Commonwealth, 51 S. W. 524, (Ky.), the Court of Appeals held, under an anti-trust statute admittedly very different in phraseology from the Ohio and Texas acts, and which I quote hereinafter for another purpose, that the business of insurance was not included in the word "commodity." In 1899, the legislature of Michigan passed an anti-trust act, the entitling clause of which was exceedingly detailed as to its purposes, but the whole body of the act is a literal transcript of the Ohio statute. In the case of Guthard v. Goodrich, in the Wayne County Circuit Court, the statute came under construction as to the extent of its prohibitions. The defendants formed the Fire Underwriters' Club of Detroit, an association similar to the one of defendants at bar. An injunction was sought against them by plaintiffs, and it was held, although the injunction was granted for other reasons, that insurance and combinations of underwriters did not come under the ban of the statute. Reliance is placed on the fact that the statute is a copy of the Texas act, (it is, as I said before, a literal copy of the Ohio act,) and the decision in 86 Texas, 250, is followed as to the construction placed upon the act by the supreme court of that state before Michigan adopted its act. All the cases hereinafter cited are reviewed and distinguished in this case.

While the injunction was granted in this case, it must be noted that plaintiffs had been members of the association, and the association sought to enforce against them a penalty in the shape of a fine to be deducted from their membership deposit. The court held that "the maxim of coming in equity with clean hands was not applicable, and that plaintiffs were entitled to an injunction, restraining the club from enforcing any bylaw which authorizes the imposition of a pecuniary fine for doing business with a person outside of the club in any lawful way he may wish." It was purely a case of a controversy between parties to the compact as distinguished from relief sought by a stranger. Plaintiff relies upon, In Re Pinkney, 47 Kans., 89; State v. Phipps, 50 Kans., 609; Beachly v. Mulville, 102 Iowa, 602; Fire Ins. Co. v. State, 75 Miss., 24; State v. Fireman's Fund Co., 52 S. W., 595, (Mo.)

In Re Pinkney, decided by a divided court of three judges, Judge Horton dissenting, turned upon the title of the act, which was "an act to declare unlawful trusts and combinations in restraint of trade," etc., and upon the constitutional provision in Kansas, (which is mandatory) that no bill shall contain more than one subject which shall be clearly expressed in its title.

Section 1 of the act in question contained a specific provision for the prevention of combinations which tend "to control the cost or

rate of insurance," and the court held that while it could not extend the scope of the title, by unnatural and unwarrantable definitions, yet if the words used, admit of a construction given to them by the legislature, and can be used properly in a sense broad enough to include the provision of the act, the intention of the legislature is entitled to great weight in determining the sufficiency of the title. Hence, the court held that "trade" having a warranted signification of occupation, employment or business, they would infer that the legislature intended that sense, and thus uphold the statute. The State v. Phipp, 50 Kans., 609, was a reaffirmation of In Re Pinkney, the same Judge dissenting. In Beechly v. Mulville, the court took a view of the meaning of "commodity" directly contrary to that taken in Insurance Co. v. State, 86 Texas, supra, holding that it meant convenience, privilege, profit, etc., as well as goods, wares and merchandise, and saw no reason why it should be restricted to its popular sense. "Selling insurance" is a term, say thay, used in the insurance business, and "there are the same reasons why it" (the insurance business) "should be protected against combinations as there are in matters clearly within the provisions of the law;" a reason, it seems to me, which argues *why* the law should be extended to it, and no answer to the question, does the law cover it? Fireman's Ins. Co. v. State, 75 Miss., 24, is not helpful on the question, because the statute of that state covers all kinds of business, and the court in its opinion, at page 39, expressly says that "it is perfectly manifest that that act" (the Texas statute) "did not embrace insurance trusts." State v. Fireman's Fund Ins. Co., 52 S. W., 595, (Mo.) is not applicable, because it was decided under the Missouri act prohibiting pools and combinations of insurance companies, and the point of decision is to hold the companies liable for the acts of their agents in forming such combinations. Weighing these citations of plaintiff, the Mississippi and Missouri cases may be discarded as not pertinent; the Kansas case was decided to avoid a constitutional infirmity; and the Iowa case on the theory of what the statute ought to have been, not what it was, and in direct violation of the elementary rule that words are to be taken in their plain, everyday, popular sense, unless it is clearly manifest that they have been used in some other sense.

Our statute was plainly borrowed in all its material and substantial features, from the Texas act, and while the rule laid down in Pain v. Mason, 7 O. S., would justify the adoption of the construction placed upon that statute before its enactment here, by the Supreme Court of Texas, yet were the question a matter of first instance before me, the reasoning of that court in reaching its conclusions, based upon every aspect of the statute, whether we consider it in the light of the old law or of the conditions which gave rise to the new law, or of the accepted meaning of words, and of well understood phrases, or of the historical features of the rise and development of these combinations, appears to me to be so sound and convincing that I can not but accept it, unless plaintiff's contention that the emendation of the title of the Ohio act simplified its scope. As to the addition of the word "commerce" that has been disposed of. Do the words "and all classes of business in the state," extend the operation of the Ohio statute beyond the fields covered by the Texas statute?

If we look at the question historically, we find that the Texas act was first passed in 1889, that the ambiguity of the words and phrases, "trade," "commerce," "commodity," and "restrictions in trade," was raised in and disposed of by the Supreme Court of Texas in 1893, and that the statute was amended in 1895 to meet the objection of the Supreme Court of that state. The Ohio statute was passed in 1898, substantially incorporating all of the provisions of the Texas act of 1889, with additions, not of the amended Texas act of 1895, but such as I have noted hereinbefore. Our own supreme court has settled in various cases the doctrine that when the legislature of Ohio takes the statute of another state, it takes it with the construction placed upon it by the court of last resort of that state. And there would be no difficulty, I take it, in applying this doctrine here, if the Ohio adoption of the statute had antedated the amended Texas act of 1895.

How far our or any legislature would be presumed to follow changes and amendments in statutes borrowed, is a question I would not attempt to answer. In the Michigan case, hereinbefore quoted, Judge Hosmer said that the Texas amendment of 1895 not appearing in the Michigan statute, it was not incorporated into the Michigan law. Most of the ambiguity in the original Texas statute turned on the word "trade." and after a long discussion beginning at page 263. of the Report, the Texas Supreme Court in Ins. Co. v. The State, supra, held that "trade" was the nere equivalent of traffic and commerce. Our legislature, very evidently then to avoid this ambiguity in our statute added on the word "commerce," to trade, as a syno-

nym or equivalent, and not by way of contrast. The word commerce was left untouched in the title, and the clause "all classes of business in the state" added. Now, if the title itself were under construction instead of being used as an aid to the construction of the body of the statute, it seems to me that the phrase "all classes of business" being general in its terms would be restrained in its application, to "commerce," and that the title of the statute is intended to denote its application and limitation to all classes of business engaged in or devoted to commerce. A construction of that kind relieves all ambiguity and makes the application clear. Otherwise, if we are to give the word "business" either its large signification of embracing "everything about which a person can be employed," or even its ordinary and confined sense of "that which occupies the time, attention and labor of a man for the purpose of a livelihood or profit," then we are bound logically to include within the prohibitions of this statute all that class of unions and combinations, unqualifiedly recognized to be lawful, devoted to workingmen, laborers and journeymen, tradesmen    The policy of Ohio legislation, as manifested in various other acts, is clearly the other way, to encourage and protect such unions. Reasoning from the title itself, apart from any consideration of other states' legislation, nothing much of satisfaction can be accomplished; for while the rule is that the title to an act, while no part of it, may sometimes be resorted to aid in the construction, yet that is for the purpose of removing ambiguities: Lafayette Benefit Society, 7 O. R. pt. 1, at page 36; and then as said by Sedgewick in his work on Statutory Construction, at page 40, the title is rarely a matter of legislative debate or scrutiny, and though it may and does doubtless give a general idea of the purport of the act, it is precisely in cases of nicety and doubt that it can not with safety be relied on. In this dilemma it seems to me the safe course to steer by the old chart of following the construction given in the state of original enactment.

The last question or contention made by the plaintiff is based upon Section 3659, Rev. Stat., which provides, among other things if any foreign insurance company, association or partnership doing business in this state * * * "shall enter into any compact or combination with other insurance companies, or shall require their agents to enter into any compact with or combination with other insurance agents or companies, for the purpose of governing or controlling the rates charged for fire insurance on any property within this state" * * * "the superintendent of insurance shall forthwith revoke and recall the license or authority to do or transact business within this state, and no renewal of authority shall be granted to it for three years after such revocation." Now, it will be observed that this statute is penal in its nature, and is directed against principals in the insurance business.    On account of its penal nature, it must be strictly construed, and its provisions will not be extended either as to persons or the remedy.    Certainly the *agents* could not be in any way punished under this statute; that is clear.    Can an outsider have a remedy against them, or even against the companies?    Section 3915, of Chapter 101, of the Kentucky Statutes, provided that if any corporation, foreign or domestic, person, etc., entered into any combination for the purpose of controlling or regulating or fixing the prices of any merchandise, etc., such corporation, etc., should be deemed guilty of a conspiracy and punished as provided for subsequently.

Section 3917 provided a penalty by way of fine, or imprisonment, or both, for the violation of Sec. 3915; and Sec. 3917, declared contracts in violation of Sec. 3915 null and void.    In Brewster v. Miller, 41 S. W., 301, heretofore referred to, an Undertakers' Association formed for the purpose of controlling and regulating prices was involved.    The association members refused to sell to plaintiff, and he sued for alleged damages sustained. And it was held that Section 3915 gave *him* no right of action, the court saying that "it is hardly necessary to observe that this is not an indictment against the members of the association for the violation of Section 3915, nor is it an action to enforce any contract or agreement in violation of that section.    *"The association might be guilty of the violation of this chapter of the Kentucky statutes, and yet plaintiff would not have a cause of action against the members thereof."*    Now, suppose the foreign insurance companies, the principals of defendants herein, in reality composed defendants' association, and no right of action could accrue against them to an outsider under Section 3659, Rev. Statutes, how could an action accrue against the agents who are not even provided against in the section? The case of The State v. Fireman's Ins. Co., 52 S. W., 595, (Mo.), cited by plaintiff does not meet the question presented here, for in that case the insurance companies themselves were held responsible for the combinations of their agents, but the case can not stand as authority for the proposi-

tion that the agents themselves would be individually liable. This closes all the questions raised in this case, and the result of my consideration of and reflection over the evidence in connection with the law as I find it from the study of the cases; is that working under some pressure, I have given it a good deal of thought and care. I have made it a point to examine carefully every authority cited to me, and I have found a few myself. I think my conclusions on the points involved are sound, although I am not now prepared to say what might have been the decision had the plaintiff developed facts involving a perversion of the defendants' association's legitimate purposes, under the law of competition, and tending to show express malice towards him, and intend to injure him. The judgment will be for the defendants.

*Prescott Smith,* for Plaintiff.

*G. H. Wald* and *T. B. Paxton,* for Defendants.