(Opinion published 55 N. W. Rep. 1123.)

---

BOHN MANUFACTURING Co. *vs.* W. G. HOLLIS *et al.*

Argued April 18, 1893.   Reversed July 20, 1893.

**The Right to Combine and Refuse to Deal with a Particular Party.**
Any man (unless under contract obligation, or unless his employment charges him with some public duty) has a right to refuse to work for or deal with any man or class of men, as he sees fit; and this right, which one man may exercise singly, any number may agree to exercise jointly.

**The Facts Stated.**
A large number of retail lumber dealers formed a voluntary association, by which they mutually agreed that they would not deal with any manufacturer or wholesale dealer who should sell lumber directly to consumers, not dealers, at any point where a member of the association was carrying on a retail yard, and provided in their by-laws that, whenever any wholesale dealer or manufacturer made any such sale, their secretary should notify all the members of the fact. The plaintiff having made such a sale, the secretary threatened to send notice of the fact, as provided in the by-laws, to all the members of the association. *Held* not actionable, and no ground for an injunction.

Appeal by defendants, W. G. Hollis and the Northwestern Lumbermen's Association, from an order of the District Court of Ramsey County, *W. D. Cornish*, J., made December 27, 1892, refusing to dissolve an injunction.

In the year 1890 a large number, about one-half, of the retail dealers in lumber in Iowa, Minnesota, Nebraska and the Dakotas associated together under the name Northwestern Lumbermen's Association and adopted a constitution and by-laws. Their principal place of business was St. Paul. They employed defendant W. G. Hollis as secretary. Some of their by-laws were as follows:

Sec. 3. Whenever, and as often as, any wholesale dealer shall sell lumber, or any article manufactured from lumber and generally sold by retail lumber dealers, to any person not a regular dealer, any member doing business in the town to which such shipments are made, must notify the secretary of this association within thirty days after the arrival of the shipment at the point of destination, who thereupon shall notify the manufacturer or wholesale dealer who made such shipment that he has a claim of ten per cent. of the value of such sale at the point of shipment, against him for such shipment. If the secretary is unable to adjust such claim either by correspondence or by personal presentation of the case, he shall refer the matter to the Board of Directors, whose duty it shall be to hear both sides of the case and determine the claim. If the manufacturer or wholesale dealer refuses to abide by the decision of the Board of Directors, it shall be the duty of the secretary to immediately notify the members of the Association, stating the name of such wholesale dealer or manufacturer. If any member continues to deal with such wholesale dealer or manufacturer, he shall be expelled from the Association.

Sec. 3½.. The provisions of section three shall also apply to manufacturers or wholesalers who ship to contractors or consumers on the order of dealers not members of the Association, at points where said dealers do not maintain a retail yard, and where a member of the Association is located.

Sec. 4. Whenever the secretary of this Association shall succeed in collecting any claim made against a wholesaler or manufacturer, upon lumber sold to the consumer as provided for in section three

of these by-laws, the sum so collected shall be paid in equal parts to the members of this Association who shall be located at the point where such sale is made, and if there be but one member then all the sum so collected shall be paid to him.

Sec. 6. The secretary shall prepare and cause to be published, every three months, a list of all the members of this Association both active and honorary, and mail the same to all retail dealers. Also the list of all wholesale dealers and manufacturers of lumber who shall refuse to comply with the rules prescribed in section 3 of the by-laws, and mail one of each of such lists to the members of this Association.

The plaintiff, Bohn Manufacturing Company, a corporation dealing in lumber at wholesale at St. Paul, sold in 1891 to one Rakestraw, who was not a dealer, lumber for his own use to the value of $819.85, to be shipped to Worthington; and sold to Father Plut another bill of lumber of the value of $444.69, to be shipped to New Ulm for a Catholic church. The Association, hearing of these sales, demanded of the plaintiff ten per cent. of the amount of the two sales, $126.45, and threatened, unless this sum was paid, to notify each member of the Association of the sales and refusal, pursuant to said by-laws.

Thereupon plaintiff commenced this action, charging that Hollis and the other members of the Association had entered into a combination and conspiracy to monopolize and restrain trade in lumber, and to fix and control prices and compel dealers and consumers to pay the prices so fixed, and to limit the retail trade in lumber to its own members, and to extort money from any wholesale dealer who should deal directly with the consumer, and to compel all wholesale dealers to join the Association and act and deal only with its members. Plaintiff further charged that the defendants and various persons unknown to it have secretly and solemnly bound themselves under penalties to compel plaintiff and all others similarly situated to sell lumber only to them, and to wreck and destroy their business, if they sold to others not members of the Association. The plaintiff prayed an injunction, restraining defendants from issuing such notice, and from stating or mailing any other that might tend to injure plaintiff's trade or business, and

from combining with others to hinder or limit its sales and transactions in lumber.

A temporary injunction was granted *ex parte* May 17, 1892, enjoining defendants as prayed. The defendants obtained an order May 25, 1892, requiring the plaintiff to show cause June 1, 1892, why this injunction should not be dissolved. The court filed its order December 27, 1892, refusing to dissolve, and from that order this appeal is taken.

*Wm. A. Lancaster*, for appellants.

Experience demonstrates that undue and unnatural competition, though it may for a time benefit the consumer, generally results in the crushing out of small competitors and a rise in prices. Only fanciful theorists of the Bellamy type indulge the hope that the producer and consumer will ever deal directly with each other. Such a condition has always been and will probably always be an unrealized dream. This Association says to the wholesalers: "You cannot expect the members of this Association to trade with you while you persist in trading directly with our customers. If you do so, our members will be notified of the fact, and they will cease trading with you." This is the full purpose and object of the organization. Its constitution and by-laws contemplate no more than this, and there has been no attempt to do more. There is not, and never has been, anything like resort to force, fraud, libel, threats or intimidation by the Association. Nor is there any secrecy about its constitution or by-laws, or its proceedings or its members, active or honorary.

In case any wholesaler sells to a consumer within the territory of a member of the Association, he is given the option of either paying ten per cent. of the gross price of such lumber to the member with whom he has competed, or of being placed upon the list of those wholesalers who sell at retail, in direct competition with the retailer. In the latter case each member agrees to thereafter [buy] no material of such wholesaler. In case a member should [trade] with such wholesaler, after being notified that the latter is [com]peting with the members of the Association, he is simply dr[opped] from membership.

If this combination or agreement is unlawful as in restraint of trade, it is only so in the sense of being void and unenforceable between the parties, but is not actionable at the instance of an outsider or stranger to it.

It is a part of every man's civil rights that he be at liberty to refuse business relations with any person whomsoever, whether the refusal rests upon reason or is the result of whim, caprice, prejudice or malice. Cooley, Torts, 278; *Carew* v. *Rutherford*, 106 Mass. 1; *Bowen* v. *Matheson*, 14 Allen, 499; *Snow* v. *Wheeler*, 113 Mass. 179; *Walker* v. *Cronin*, 107 Mass. 555; *Payne* v. *Western & Atlantic R. Co.*, 13 Lea, 507.

What a party has a right to do cannot be rendered actionable simply because the party is moved or induced to do it through ill will or malice. This proposition is reasonable and supported by authority. For it has been held many times that a man cannot be made liable to an action for use of legal process, upon a good cause of action, though he made use of it knowing and intending that it would ruin or bankrupt the defendant. *Morris* v. *Tuthill*, 72 N. Y. 575; *Mahan* v. *Brown*, 13 Wend. 261; *Phelps* v. *Nowlen*, 72 N. Y. 39.

Plaintiff maintains that the agreement among the defendants not to trade with any wholesaler who persists in selling at retail, in competition with any of the members of said Association, is in restraint of trade and against public policy and void, and actionable at the instance of any outsider who finds his trade reduced or affected thereby. There is not, and never has been, any authority for this claim. Not a single case can be found where anything more was ever held than simply that a contract in general restraint of trade is void or unenforceable between the parties thereto. There is not even an intimation in any of the cases that such a contract, though void, is actionable at the instance of third parties. In some of the cases the courts have used the words, unlawful or illegal, but in every such case the context shows that they were used only in the sense of void. It has always been considered a sufficient remedy or protection to the public that such contracts would not be enforced by the courts, but that parties thereto must rely wholly

upon their voluntary performance. *Hilton* v. *Eckersley*, 6 E. & B. 64; *Hornby* v. *Close*, L. R. 2 Q. B. 153.

I desire to call the court's attention to the case of *Mogul Steamship Co.* v. *McGregor*, which first appears in 15 Q. B. Div. 476, (1885) upon an application for an *ad interim* injunction, which was denied; and again in the 21 Q. B. Div. 544, (1888) where Lord C. J. Coleridge's decision upon the merits in favor of defendants is reported; and again in the 23 Q. B. Div., (1889) where the decision of Lord Coleridge was affirmed by the Court of Appeals; and again in [1892] App. Cas., 25, where it was finally affirmed. I respectfully submit the several decisions in the Mogul Case to the careful consideration of this court and, with deference, insist that they are conclusive against the plaintiff in this action.

*Warner, Richardson & Lawrence,* for respondent.

The injunction in this case will not be dissolved on the ground that plaintiff has an adequate remedy at law, because it cannot have adequate relief under the circumstances disclosed here. If it can be damaged at all, and it claims it can and will be, its damages must necessarily be of a most serious nature. The allegations in the complaint amount to charges of criminal conspiracy against plaintiff and the public, to an unlawful combination to extort money from it and the public, to wrongful and unlawful threats and acts of intimidation which must result in pecuniary loss to it. If the facts are as claimed, defendants are punishable criminally, both under the common law and by statute. *State* v. *Pulle*, 12 Minn. 164, (Gil. 99;) *State* v. *Norton*, 23 N. J. Law, 33; *Reg.* v. *Rowlands*, 17 Q. B. 671; *Spies* v. *People*, 122 Ill. 1; *State* v. *Glidden*, 55 Conn. 46; *Morris Run Coal Co.* v. *Barclay Coal Co.*, 68 Pa. St. 173.

If the injured party wishes to have his damages repaired he must seek his remedy in a civil action. So it has been and is held that civil actions claiming damages may be maintained for injuries such as those outlined by the complaint, after the injuries are inflicted and damage has resulted. *Kimball* v. *Harmon*, 34 Md. 401; *Place* v. *Minster*, 65 N. Y. 89; *Carew* v. *Rutherford*, 106 Mass. 1; *Old Dominion Steamship Co.* v. *McKenna*, 30 Fed. Rep. 48; *Walker* v. *Cronin*, 107 Mass. 555.

In this case the defendants, although they have combined and conspired, have, as yet, only threatened plaintiff with damage; they have not carried their threats into execution.    The nature of the threats clearly appears; they mean that unless plaintiff pays the money demanded, and ceases to transact business with consumers, they will stop its business altogether.    This is a direct attack upon its property.    It makes no difference what form of words they use. He who runs and reads knows instantly that they mean "boycott." *In re Wabash R. Co.*, 24 Fed. Rep. 217; *In re Doolittle*, 23 Fed. Rep. 544.

The class of middle men, which defendants seek to build up, may make a livelihood either practically without work if they are con-tent to live upon the ten per cent. which comes from the sales of others, and if those sales keep up, or, if they prefer they should not keep up, they can raise the ten per cent. to twenty or thirty until they shut out competition altogether.    *State* v. *Donaldson*, 32 N. J. Law, 151; *Crump* v. *Commonwealth*, 84 Va. 927; *State* v. *Glidden*, 55 Conn. 46.

Defendants claim that they can proceed to destroy plaintiff's business in the fashion that they have undertaken, by threats, intim-idation and boycott, but that plaintiff is remediless until after their work is actually done, and that then plaintiff must be satisfied either with a civil action for money damages, or with criminal pro-ceedings instituted against the wrongdoers.    This is not true. Courts of equity protect us in other directions.    They can step in to guard trade and commerce.    We fail to see why not—equity jurisdiction is broad.    Its courts extend their protecting arms here and there to prevent injustice.    They have· built up an ideal sys-tem.    From ancient days the Chancellors have been willing to ex-tend its benefits so as to do justice, to help the oppressed.    When-ever new and unheard of evils have arisen they have come to the rescue and prevented injury from being done, if no adequate remedy existed at law for the wrong after it was done.    1 Pom. Eq. § 111; *Casey* v. *Cincinnati Typog. Union*, 45 Fed. Rep. 135 ; *Sherry* v. *Per-kins*, 147 Mass. 212; *Coeur D'Alene·C. & M. Co.* v. *Miner's Union*, 51 Fed. Rep. 260; *Springhead Spin. Co.* v. *Riley*, L. R. 6 Eq. Cas. 551.

MITCHELL, J. The pleadings in this case, and the affidavits read on the motion to dissolve the temporary injunction, are so voluminous, and so abound in mere inferences as to motives and consequences, and in adjectives and other qualifying epithets, as to convey the impression, at first sight, that the facts were both complicated and controverted. But a careful analysis of the record proves that there is no real dispute as to the material facts, which are comparatively simple. Stripped of all extraneous matter, the case discloses just this state of facts: The plaintiff is a manufacturer and vendor of lumber and other building material, having a large and profitable trade at wholesale and retail in this and adjoining states, a large and valuable part of this trade being with the retail lumber dealers. The defendant the Northwestern Lumbermen's Association is a voluntary association of retail lumber dealers, comprising from twenty-five to fifty per cent. of the retail dealers doing business in the states referred to, many of whom are, or have been, customers of the plaintiff. A "retailer," as defined in the constitution of the association, is "any person who is engaged in retailing lumber, who carries at all times a stock of lumber adequate to the wants of the community, and who regularly maintains an office as a lumber dealer, and keeps the same open at proper times." Any wholesale dealer or manufacturer of lumber who conforms to the rules of the association may become an honorary member, and attend its meetings, but is not allowed to vote. The object of the association is stated in its constitution to be "the protection of its members against sales by wholesale dealers and manufacturers to contractors and consumers." The object is more fully stated, and the means by which it is to be carried into effect are fully set out, in sections 3, $3\frac{1}{2}$, 4, and 6 of the by-laws, which are all that we consider material in this case. The plaintiff sold two bills of lumber directly to consumers or contractors at points where members of the association were engaged in business as retail dealers. Defendant Hollis, the secretary of the association, having been informed of this fact, notified plaintiff, in pursuance of section 3 of the by-laws, that he had a claim against it for ten per cent. of the amount of these sales. Considerable correspondence with reference to the matter ensued, in which the plaintiff, from time to time, promised to adjust the matter, but

procrastinated and evaded doing so for so long that finally Hollis threatened that unless plaintiff immediately settled the matter he would send to all the members of the association the lists or notices provided for by section 6 of the by-laws, notifying them that plaintiff refused to comply with the rules of the association, and was no longer in sympathy with it. Thereupon, plaintiff commenced this action for a permanent injunction, and obtained, *ex parte,* a temporary one, enjoining the defendants from issuing these notices, etc. This appeal is from an order refusing to dissolve the temporary injunction. It is alleged, and in view of the facts must be presumed to be true, that if these notices should be issued the members of the association would thereafter refuse to deal with the plaintiff, thereby resulting in loss to it of gains and profits.

The case presents one phase of a subject which is likely to be one of the most important and difficult which will confront the courts during the next quarter of a century. This is the age of associations and unions, in all departments of labor and business, for purposes of mutual benefit and protection. Confined to proper limits, both as to end and means, they are not only lawful, but laudable. Carried beyond those limits, they are liable to become dangerous agencies for wrong and oppression. Beyond what limits these associations or combinations cannot go, without interfering with the legal rights of others, is the problem which, in various phases, the courts will doubtless be frequently called to pass upon. There is, perhaps, danger that, influenced by such terms of illusive meaning as "monopolies," "trusts," "boycotts," "strikes," and the like, they may be led to transcend the limits of their jurisdiction, and, like the court of king's bench in Bagg's Case, 11 Coke, 98a, assume that, on general principles, they have authority to correct or reform everything which they may deem wrong, or, as Lord Ellsmere puts it, "to manage the state." But whatever doubts or difficulties may arise in other cases, presenting other phases of the general subject involved here, it seems to us that there can be none on the facts of the present case. Both the affidavits and brief in behalf of the plaintiff indulge in a great deal of strong, and even exaggerated, assertion, and in many words and expressions of very indefinite and illusive meaning, such as "wreck," "coerce," "extort," "conspiracy," "monopoly," "drive out of business,"

and the like. This looks very formidable, but in law, as well as in mathematics, it simplifies things very much to reduce them to their lowest terms. It is conceded that retail lumber yards in the various cities, towns, and villages are not only a public convenience, but a public necessity; also, that, to enable the owners to maintain these yards, they must sell their lumber at a reasonable profit. It also goes without saying that to have manufacturers or wholesale dealers sell at retail, directly to consumers, in the territory upon which the retail dealer depends for his customers, injuriously affects and demoralizes his trade. This is so well recognized as a rule of trade, in every department, that generally wholesale dealers refrain from selling at retail within the territory from which their customers obtain their trade. Now, when reduced to its ultimate analysis, all that the retail lumber dealers, in this case, have done, is to form an association to protect themselves from sales by wholesale dealers or manufacturers, directly to consumers or other nondealers, at points where a member of the association is engaged in the retail business. The means adopted to effect this object are simply these: They agree among themselves that they will not deal with any wholesale dealer or manufacturer who sells directly to customers, not dealers, at a point where a member of the association is doing business, and provide for notice being given to all their members whenever a wholesale dealer or manufacturer makes any such sale. That is the head and front of defendants' offense. It will be observed that defendants were not proposing to send notices to any one but members of the association. There was no element of fraud, coercion, or intimidation, either towards plaintiff or the members of the association. True, the secretary, in accordance with section 3 of the by-laws, made a demand on plaintiff for ten per cent. on the amount of the two sales. But this involved no element of coercion or intimidation, in the legal sense of those terms. It was entirely optional with plaintiff whether it would pay or not. If it valued the trade of the members of the association higher than that of nondealers at the same points, it would probably conclude to pay; otherwise, not. It cannot be claimed that the act of making this demand was actionable; much less, that it constituted any ground for an injunction; and hence this matter may be laid entirely out of view.

Nor was any coercion proposed to be brought to bear on the members of the association, to prevent them from trading with the plaintiff. After they received the notices, they would be at entire liberty to trade with plaintiff, or not, as they saw fit. By the provisions of the by-laws, if they traded with the plaintiff, they were liable to be "expelled;" but this simply meant to cease to be members. It was wholly a matter of their own free choice, which they preferred,—to trade with the plaintiff, or to continue members of the association. So much for the facts, and all that remains is to apply to them a few well-settled, elementary principles of law:

1. The mere fact that the proposed acts of the defendants would have resulted in plaintiff's loss of gains and profits does not, of itself, render those acts unlawful or actionable. That depends on whether the acts are, in and of themselves, unlawful. "Injury," in its legal sense, means damage resulting from an unlawful act. Associations may be entered into, the object of which is to adopt measures that may tend to diminish the gains and profits of another, and yet, so far from being unlawful, they may be highly meritorious. *Commonwealth* v. *Hunt*, 4 Met. (Mass.) 111; *Mogul Steamship Co.* v. *McGregor*, 21 Q. B. Div. 544.

2. If an act be lawful,—one that the party has a legal right to do,—the fact that he may be actuated by an improper motive does not render it unlawful. As said in one case, "the exercise by one man of a legal right cannot be legal wrong to another," or, as expressed in another case, "malicious motives make a bad case worse, but they cannot make that wrong which, in its own essence, is lawful." *Heywood* v. *Tillson*, 75 Me. 225; *Phelps* v. *Nowlen*, 72 N. Y. 39; *Jenkins* v. *Fowler*, 24 Pa. St. 308.

3. To enable the plaintiff to maintain this action, it must appear that defendants have committed, or are about to commit, some unlawful act, which will interfere with, and injuriously affect, some of its legal rights. We advert to this for the reason that counsel for plaintiff devotes much space to assailing this association as one whose object is unlawful because in restraint of trade. We fail to see wherein it is subject to this charge; but, even if it were, this would not, of itself, give plaintiff a cause of action. No case can be found in which it was ever held that, at common law, a contract or agreement in general restraint of trade was actionable

at the instance of third parties, or could constitute the foundation for such an action. The courts sometimes call such contracts "unlawful" or "illegal," but in every instance it will be found that these terms were used in the sense, merely, of "void" or "unenforceble" as between the parties; the law considering the disadvantage so imposed upon the contract a sufficient protection to the public. *Mogul Steamship Co.* v. *McGregor*, 23 Q. B. Div. 598, [1892] App. Cas. 25.

4. What one man may lawfully do singly, two or more may lawfully agree to do jointly. The number who unite to do the act cannot change its character from lawful to unlawful. The gist of a private action for the wrongful act of many is not the combination or conspiracy, but the damage done or threatened to the plaintiff by the acts of the defendants. If the act be unlawful, the combination of many to commit it may aggravate the injury, but cannot change the character of the act. In a few cases there may be some loose remarks apparently to the contrary, but they evidently have their origin in a confused and inaccurate idea of the law of criminal conspiracy, and in failing to distinguish between an unlawful act and a criminal one. It can never be a crime to combine to commit a lawful act, but it may be a crime for several to conspire to commit an unlawful act, which, if done by one individual alone, although unlawful, would not be criminal. Hence, the fact that the defendants associated themselves together to do the act complained of is wholly immaterial in this case. We have referred to this for the reason that counsel has laid great stress upon the fact of the combination of a large number of persons, as if that, of itself, rendered their conduct actionable. *Bowen* v. *Matheson*, 14 Allen, 499; *Mogul Steamship Co.* v. *McGregor*, 23 Q. B. Div. 598, [1892] App. Cas. 25; *Parker* v. *Huntington*, 2 Gray, 124; *Wellington* v. *Small*, 3 Cush. 145; *Payne* v. *Western & Atlantic R. Co.*, 13 Lea, 507.

5. With these propositions in mind, which bring the case down to a very small compass, we come to another proposition, which is entirely decisive of the case. It is perfectly lawful for any man (unless under contract obligation, or unless his employment charges him with some public duty) to refuse to work for or to deal with any man or class of men, as he sees fit. This doctrine is founded

upon the fundamental right of every man to conduct his own business in his own way, subject only to the condition that he does not interfere with the legal rights of others. And, as has been already said, the right which one man may exercise singly, many, after consultation, may agree to exercise jointly, and make simultaneous declaration of their choice. This has been repeatedly held as to associations or unions of workmen, and associations of men in other occupations or lines of business must be governed by the same principles. Summed up, and stripped of all extraneous matter, this is all that defendants have done, or threatened to do, and we fail to see anything unlawful or actionable in it. *Commonwealth* v. *Hunt, supra*; *Carew* v. *Rutherford*, 106 Mass. 1; *Mogul Steamship Co.* v. *McGregor*, [1892] App. Cas. 25.

Order reversed, and injunction dissolved.

VANDERBURGH, J., absent, took no part.

(Opinion published 55 N. W. Rep. 1119.)