## Richmond.

### HARRIS AND OTHERS v. COMMONWEALTH.

February 2, 1912.

1. COMMON LAW—*Principles of.*—The principles of the common law are elastic, and one of its peculiar merits is that it adapts itself to the rights of parties under changed circumstances; but it is sometimes. difficult to ascertain what these principles are, owing to the fact that the cases and text writers are not in harmony on the subject.

2. CRIMINAL CONSPIRACY—*Definition.*—A conspiracy, to be criminal, must be a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose, or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means.

3. CONSPIRACY—*Combination to Raise Insurance Rates—Restraint of Trade.*— Conceding that a combination to fix, regulate, and control the business of fire insurance in a particular locality is an agreement in restraint of trade, agreements merely in restraint of trade are not, in the absence of statute, illegal in the sense that they are either indictable or actionable. Persons engaged in the insurance business may, in the absence of statutory regulation, agree upon the terms, conditions, and rates. upon which they are willing to insure, and induce others engaged in the same business to unite with them in maintaining such terms, conditions, and rates; provided they use no unlawful means in accomplishing their objects. Insurance is not an article of merchandise or manufacture, nor one of the "necessaries of life," or of prime necessity, within the letter or spirit of the laws against engrossing.

4. CONSPIRACY—*Criminal Offense—How Charged.*—Where the object of an alleged conspiracy is not criminal or illegal, and the illegality lies. in the means by which that object is to be effected, the means must be set forth in the indictment, warrant, or other charge, and must be such as to constitute an offense at common law, or by statute. It is not sufficient to charge that the parties "fraudulently" or "unlawfully" conspired to "coerce," "intimidate," and the like; but the facts must be averred which go to show the fraud, coercion, or intimidation.

5. CONSPIRACY—*Raising Insurance Rates—Motive—Public Policy.*—As persons and corporations have the right to fix the rate at which they will insure property, they may raise their rates at pleasure, and any

number of them may agree, in the absence of statutory regulation, among themselves, to maintain the increased rate, and it is wholly immaterial what motive may have induced them to do so. The act itself being lawful, it is not rendered unlawful by the motive which induced it. If public policy requires that combinations to raise and maintain insurance rates should be limited or suppressed, it is a subject to be dealt with by the legislature, and not by the courts.

Error to a judgment of the Corporation Court of the city of Newport News.

*Reversed.*

. The opinion states the case.

*O. D. Batchelor, Randolph Harrison, J. Winston Read,* and *Alexander C. King,* for the plaintiffs in error.

*Samuel W. Williams, Attorney General,* and *C. C. Berkeley,* for the Commonwealth.

BUCHANAN, J., delivered the opinion of the court.

This is a prosecution for criminal conspiracy. It was commenced before a justice, but, upon appeal to the Corporation Court of the city of Newport News, the warrant was, by leave of the court, amended.

The amended warrant is quite long. It charges, in substance, that on May 17, 1910, and previously, for a number of years, a large number of insurance companies had been doing all the fire insurance business of the city, which insurance was a necessity to all persons owning property in the city; that prior to the said 17th of May the city authorities had passed an ordinance requiring a certain license tax to be paid by each fire insurance company doing business in the city for the license year beginning May 1, 1910; that the (six) plaintiffs in error and some twenty other persons, naming them, and others unknown, together with all the said fire insurance companies and associations, did, on the 17th of the said May, with a wanton and malicious intent to damage and injure, oppress, and coerce the persons owning

property in the city, and the council of the city and the members thereof acting in their official capacity, "maliciously, immorally, corruptly, wantonly, and fraudently, unlawfully, and wickedly, conspire, combine, confederate, and agree together, with intent aforesaid," by coercion and intimidation, to arbitrarily fix, establish, regulate, control, charge, and collect the premiums of insurance on all policies and contracts of insurance issued and to be issued by the said insurance companies and all others who might attempt to do a fire insurance business in the city, and all their agents, on all property in the city, for the purpose of maintaining a wicked and exclusive monopoly of all the fire insurance business done in the city and State, and, with like intent, to stifle and destroy all competition in fire insurance in the city, and, with like intent, to arbitrarily charge, coerce, extort, and collect the non-competitive rates and premiums so arbitrarily fixed, and to prevent persons owning property in the city from procuring fire insurance at any other than the said established non-competitive rates, and thereby coerce and intimidate said council and its members to repeal the said license tax on said fire insurance companies—all of which was charged to be to the great damage of the city and State, the council and its members, and against the peace and dignity of the Commonwealth.

The warrant further charged that, pursuant to said conspiracy, the parties had done the said acts complained of.

There are numerous assignments of error, but in the view we take of the case it will be unnecessary to consider any of them except the demurrer to the warrant.

That demurrer is, in substance, that the warrant does not charge a criminal offense.

It is conceded that there is no statute of this State prohibiting such a combination as that charged in the amended warrant, but the contention of counsel for the Commonwealth is that the combination charged is a crime at common law.

No case is cited by the counsel for the Commonwealth which holds that a combination of fire insurance companies and associations, to fix, regulate, and control fire insurance rates, is a criminal conspiracy at common law; but the claim is that the common law "is an expansive, elastic, progressive system, and its old

principles are as effective to-day to prevent unlawful conspiracies to oppress the people in the exercise of their rights to enjoy the benefits of modern insurance as it is to protect the people to-day in their rights to enjoy wholesome food at reasonable prices."

It is true that the principles of the common law are elastic, and that one of its peculiar merits is that it adapts itself to the rights of parties under changed circumstances (*Foster* v. *Commonwealth*, 95 Va. at pp. 309–10, 31 S. E. 503, 42 L. R. A. 589, 70 Am. St. Rep. 846), but the difficulty is in ascertaining what are the principles or rules of the common law as to criminal conspiracies. The cases and text-writers are not agreed on the subject.

The definition or description which seems to be more generally adopted is that a conspiracy must be a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose, or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means. See *Jones's Case*, 4 B. & A. 45, *Pettibone* v. *U. S.*, 148 U. S. 197, 37 L. Ed. 419, 13 Sup. Ct. 542; *Com.* v. *Hunt*, 4 Metc. (Mass.) 111; 38 Am. Dec. 346; *Mogul Steamship Co.* v. *McGregor, &c.*, 23 Q. B. Div., p. 624; Wright on Cr. Conspiracy (Carson's ed.), 48, 110–111, and authorities cited; 2 Wharton's Cr. Law, sec. 1337.

It is insisted that the object of the combination charged in the warrant was to create and maintain a monopoly in the fire insurance business in the city of Newport News, and that the creation of a monopoly in an article of necessity was a criminal offense at common law.

It seems to be settled that there was no prohibition at common law against the creation of a monopoly by individuals. Chief Justice White, in *Standard Oil Company* v. *United States*, 221 U. S. 1, 52, 55, 55 L. Ed. 619, 31 Sup. Ct. 502, 512, 34 L. R. A. (N. S.) 834, says it is remarkable that nowhere at common law can there be found a prohibition against the creation of monopoly by an individual. "The frequent granting of monopolies" (by the sovereign), "and the struggle which led to a denial of the power to create them—that is to say, to the establishment that they were incompatible with the English constitution—is known to all, and need not be reviewed. The evils which led to the public outcry

against monopolies and to the final denial of the power to make them may be thus summarily stated: (1) The power which the monopoly gave to the one who enjoyed it to fix the price, and thereby injure the public; (2) the power which it engendered of enabling a limitation on production; and (3) the danger of deterioration in quality of the monopolized article, which it was deemed was the inevitable resultant of the monopolistic control over its production and sale. As monopoly as thus conceived embraced only a consequence arising from an exertion of sovereign power, no express restrictions or prohibitions obtained against the creation by an individual of a monopoly as such. But, as it was considered, at least so far as the necessaries of life were concerned, that individuals, by the abuse of their right to contract, might be able to usurp the power arbitrarily to enhance prices, one of the wrongs arising from monopoly, it came to be that laws were passed relating to offenses such as forestalling, regrating, and engrossing, by which prohibitions were placed upon the power of individuals to deal under such circumstances and conditions as, according to the conception of the times, created a presumption that the dealings were not simply the honest exertion of one's right to contract for his own benefit, unaccompanied by a wrongful motive to injure others, but were the consequence of a contract or course of dealing of such a character as to give rise to the presumption of an intent to injure others, through the means, for instance, of a monopolistic increase of prices. This is illustrated by the definition of engrossing found in the statute, 5 and 6 Edw. VI., ch. 14, as follows:

" 'Whatsoever person or persons * * * shall engross or get into his or their hands by buying, contracting, or promise-taking, other than by demise, grant, or lease of land, or tithe, any corn growing in the fields, or any other corn or grain, butter, cheese, fish, or other dead victual, whatsoever, within the realm of England, to the intent to sell the same again, shall be accepted, reputed, and taken an unlawful engrosser or engrossers.' "

After showing the difference between monopoly and engrossing, and how they afterwards became to be regarded as one and the same thing, because of the similarity of some of the evils which resulted from them, he says: "Generalizing these considerations,

the situation is this: 1. That by the common law monopolies were unlawful, because of their restriction upon individual freedom of contract, and their injury to the public. 2. That as to necessaries of life the freedom of the individual to deal was restricted where the nature and character of the dealing was such as to engender the presumption of intent to bring about at least one of the injuries which it was deemed would result from monopoly, that is an undue enhancement of price. 3. That to protect the freedom of contract of the individual, not only in his own interest, but principally in the interest of the common weal, a contract of an individual by which he put an unreasonable restraint upon himself as to carrying on his trade or business was void. And that at common law the evils consequent upon engrossing, etc., caused those things to be treated as coming within monopoly, and sometimes to be called monopoly, and the same considerations caused monopoly because of its operation and effect, to be brought within and spoken of generally as impeding the due course of, or being in restraint of trade."

From these quotations and the authorities cited in that case, and others that might be cited, it appears, we think, that combinations in restraint of trade and called monopolies, though not technical monopolies as known to the common law, were combinations, so far as pertinent to this case, among dealers in provisions, or the "necessaries of life," or "articles of prime necessity," or of "merchandise" or "manufacture in the market."

Insurance is not an article of merchandise or manufacture, or one of the "necessaries of life," or of prime necessity, within the letter or spirit of the laws against engrossing.

It was said in *Paul* v. *Virginia*, 8 Wallace 168, 19 L. Ed. 357, that "Issuing a policy of insurance is not a transaction of commerce. The policies are simple contracts of indemnity against loss by fire, entered into between the corporation and the assured, for a consideration paid by the latter. The contracts are not articles of commerce in any proper meaning of the word. They are not subjects of trade and barter, offered in the market as having an existence and value independent of the parties to them." *Hooper* v. *California*, 155 U. S. 648, 653, 15 Sup. Ct. 207, 39 L. Ed. 297.

The most that can be said as to the combination to fix, regulate, and control the business of fire insurance in the city of Newport News is that it was an agreement in restraint of trade. But agreements merely in restraint of trade are not illegal in the sense that they are either indictable or actionable.

In *Mogul Steamship Co.* v. *McGregor*, 23 Q. B. Div. 619, Bowen, L. J., in commenting upon *Hilton* v. *Eckersley*, 6 El. & Bl. 47, said that "no action at common law will lie against any individual or individuals for entering into a contract merely because it is in restraint of trade"; and, in the same connection, further said: "We are asked to hold the defendants' conference or association illegal, as being in restraint of trade. The term 'illegal' here is a misleading one. Contracts, as they are called, in restraint of trade, are not, in my opinion, illegal in any sense except that the law will not enforce them. It does not prohibit the making of such contracts; it merely declines, after they have been made, to recognize their validity. The law considers the disadvantage so imposed upon the contract a sufficient shelter to the public."

In the same case, Fry, L. J., said: "It is said that such an agreement is in restraint of trade, and therefore illegal. Be it so. But in what sense is the word 'illegal' used in such a proposition? In my opinion, it means that the agreement is one upon which no action can be sustained, and no relief obtained at law or in equity; but it does not mean that the entering into the agreement is either indictable or actionable. The authorities on this point are, I think, with a single exception, uniform. * * * The language of all the judges in the cases of *Hornby* v. *Close* and *Farrer* v. *Close* is consonant with that of Lord Campbell and Erle, J., in *Hilton* v. *Eckersley*, and Crompton, J., is, I believe, the only judge who has ever hitherto held such contracts illegal as well as void."

In *United States* v. *Addyston Pipe and Steel Co.*, 85 Fed. at p. 279, (C. C. A.), 46 L. R. A. 122, Taft, J., said: "Contracts that were in unreasonable restraint of trade at common law were not unlawful in the sense of being criminal, or giving rise to a civil action for damages in favor of one prejudicially affected thereby, but were simply void, and were not enforced by the courts. *Mogul Steamship Co.* v. *McGregor, Gow & Co.*, (1892) App. Cas. 25; *Hornby* v. *Close*, L. R. 2 Q. B. 153; Lord Campbell, C. J., in *Hilton*

v. *Eckersley*, 6 El. & Bl. 47, 66; Hannen, J., in *Farrer* v. *Close*, L. R. 4 Q. B., 602, 612."

In the case of *Queen Ins. Co.* v. *Texas*, 86 Tex. 250, 24 S. W. 397, 22 L. R. A. 483, in which that State attempted to dissolve a combination of insurance companies similar to that charged in the warrant in this case, one of the grounds urged by the Attorney General of the State was that "any article of general use and benefit to the public, which affords to the public convenience, comfort, enjoyment, and profit, ought to be protected as a 'prime necessity.' Insurance affords all these in this latter day of business progress, and has become an important factor in every business of the country and in the use and enjoyment of property and possessions and belongings." But the court refused to adopt that view, and held that such a combination was not illegal at common law, and, in doing so, said: "Insurance is a mere contract of indemnity against contingent loss. Though it is an important aid to commerce, it is not a business of commerce, or one in which the public have any direct right. No franchise is necessary for its prosecution, and no one has a right to demand of an under-writer that his property shall be insured at any rate. Any individual may execute a policy, and so any company incorporated for the purpose of insuring property may refuse to execute one, unless it be so bound by its charter. Forced insurance, for obvious reasons, is detrimental to the public interest, and it is therefore not probable that such restrictions will be found in any charter. Labor is necessary to production and transportation, and therefore it is not merely an aid, but a necessity, of commerce. It is advantageous to the public, and in that sense they have an interest in it. The services of professional men are likewise indispensable to most civilized communities, and are presumably likewise advantageous to the public. The public have an interest in them in the same sense in which they have an interest in the business of insurance. It follows, therefore, that if insurance companies are to be brought within the rule that makes agreements to increase the price of merchandise illegal, upon the ground that the public have an interest in their business, agreements among laborers, and among professional men, not to render their services below a stipulated rate, should be held contrary to public

754 Harris's Case, 113 Va. 746.

policy, and void upon the same ground. Combinations among workingmen to increase or maintain their wages by unlawful means are unlawful. But are such combinations unlawful when the only means resorted to to accomplish their objects is a refusal on the part of the parties to the agreement to accept employment at a lower rate of wages than that designated in the contract? This is the next question for determination, and it is not without difficulty."

That court, after reviewing the course of decision in this country and England, reached the conclusion that a combination of laborers, agreeing not to work except upon named conditions, no unlawful means being employed, is not a criminal conspiracy, and that neither were such contracts illegal or void on the ground of public policy; thus reaching the same conclusion upon that subject as did this court in the case of *Everett Waddey Co.* v. *Richmond Typo. Union*, 105 Va. 188, 53 S. E. 273, 5 L. R. A. (N. S.) 792. In the latter case it was held that it was not unlawful for laborers to organize for their own protection and to further their own interests, and to persuade others to join them, provided they used no unlawful means in accomplishing those objects; citing a number of cases, among others the case of *Carew* v. *Rutherford*, 106 Mass. 1, 8 Am. Rep. 287, from which is quoted, with approval, the following language: "Every man has a right to determine what branch of business he will pursue, and to make his own contracts with whom he pleases, and on the best terms he can. He may change from one occupation to another, and pursue as many different occupations as he pleases, and competition in business is lawful. He may refuse to deal with any man or class of men; and it is no crime for any number of persons, without an unlawful object in view, to associate themselves together and agree that they will not work or deal with certain men or classes of men, or work under a certain price or without certain conditions. * * * Freedom is the policy of this country."

If it be lawful for laborers to combine to control the terms of their hiring, and to induce others to unite with them for that purpose, it would seem to follow, in the absence of any statutory regulation upon the subject, that it is not unlawful for individuals or corporations engaged in the insurance business to agree upon

the terms and conditions and rates upon which they are willing to insure, and to induce others engaged in the same business to unite with them in maintaining the terms and conditions and rates so fixed and agreed upon, provided they use no unlawful means in accomplishing their objects. See, also, generally, *Cont. Ins. Co.* v. *Fire Underwriters*, (C. C.) 67 Fed. 310, and cases cited; *McCauley* v. *Tierney*, 19 R. I. 255, 23 Atl. 1, 61 Am. St. Rep. 770, 37 L. R. A. 455; *Bohn Mfg. Co.* v. *Hilles*, 54 Minn. 223, 55 N. W. 1119, 40 Am. St. Rep. 319, 21 L. R. A. 337; *State* v. *Vansant*, 136 N. C. 633, 49 S. E. 177, 68 L. R. A. 760; *Ætna Ins. Co.* v. *Com.*, 106 Ky. 864, 51 S. W. 624, 21 Ky. Law Rep. 503, 45 L. R. A. 360.

Having reached the conclusion that the agreement to fix, regulate, and control the rate of insurance in the city of Newport News was neither criminal nor unlawful, the next question is, were the means by which that end was to be accomplished criminal or illegal?

Where the object of an alleged conspiracy is not criminal or illegal, and the illegality is in the means° by which that object is to be effected, the means must be set forth, and must be such as to constitute an offense either at common law or by statute. See 2 Whar. Cr. Law (9th ed.), secs. 1358, 1367; *Pettibone* v. *United States*, 148 U. S. 197, 205, 13 Sup. Ct. 542, 37 L. Ed. 419; Wright on Cr. Cons. 197–199; and cases cited in note to *Garland* v. *State*, 21 Am. & Eng. Ann. Cases, at p. 38.

The warrant contains a great deal of strong assertion and the frequent use of the words "fraudulently," "unlawfully," "maliciously," "coercion," "intimidation," and the like, but the facts averred do not show any element of fraud, coercion, or intimidation in the legal sense of those terms. 2 Whar. Cr. Law, secs. 1367, 1368.

It is no doubt true that some acts which would subject a party to a civil action without regard to the motive with which they are done are indictable when done maliciously, and it may also be true that a combination of persons, instigated and moved by mere malice towards others as a means of doing them injury, and for no benefit to the parties to the combination, would be a criminal offense. But that is not this case. The warrant does

not so charge, and it affirmatively appears from its allegations that the city of Newport News had levied a license tax upon insurance companies doing business in the city, and that such companies had subsequently raised their insurance rates. The facts charged in the warrant show that the insurance companies had just cause for raising their rates of insurance in the city, for they had the same right, in fixing their rates of insurance, to take into consideration the license taxes they were required to pay as any other item of expense attending their business. The question involved here is whether or not, where the combination is neither in end or means criminal or unlawful, except in the sense that courts will not enforce the agreement, the motives with which the parties to the agreement are moved, as charged in the warrant, will make it a criminal offense.

The general rule, as stated in Cooley on Torts (3d ed.), p. 1505, citing numerous cases, is that "malicious motives make a bad act worse, but they cannot make that a wrong which, in its own essence, is lawful. An act which does not amount to a legal injury cannot be actionable because done with a bad intent. Where one exercises a legal right only, the motive which actuates him is immaterial." Numerous cases are cited which sustain the text.

In *Hunt* v. *Simonds*, 19 Mo. 583, it was held that an action does not lie for a conspiracy to do a lawful act. Thus, an action will not lie against the officers of insurance companies for combining to refuse to take insurance on a boat, however malicious their motive. In discussing the question involved in that case, the court said: "The damage to the plaintiff is alleged to have been produced by the refusal of the defendants to make contracts in the ordinary line of their business. It is obviously the right of every citizen to deal, or to refuse to deal, with any other citizen, and no person has ever thought himself entitled to complain in a court of justice of a refusal to deal with him, except in some cases where, by reason of the public character which a party sustains, there rests upon him a legal obligation to deal and contract with others. * * * But such is not the obligation of underwriters. The business of insuring is but a game of hazard, and there are a great many elements entering into the calculations upon which it can be safely pursued."

Again it is said: "He had no right in law to demand insurance upon his boat from one or all of the defendants, nor that they should insure the cargo on his boat, and, consequently, their refusal to insure, from any motive, however improper, could give him no right to sue them."

In *Orr* v. *Home Mut. Ins. Co.*, 12 La. Ann. 255, 68 Am. Dec. 770, it was held that a conspiracy by insurance companies that they would not insure any boat on which a certain person was employed, whereby such person was deprived of employment, did not furnish a ground of civil action, however malicious the motives of the insurance companies may have been. See *Bohn Mfg. Co.* v. *Holles*, 54 Minn. 223, 234, 55 N. W. 1119, 40 Am. St. Rep. 319, 21 L. R. A. 337; *Bowen* v. *Matheson*, 14 Allen 499.

Litigation would be endless if the motives of those who are simply doing what they have a legal right to do were made the subject of inquiry.

In *Phelps* v. *Nowlen*, 72 N. Y. 39, 45, 28 Am. Rep. 93, in which it was held that where a man has a legal right courts will not inquire into the motive by which he is actuated in enforcing the same, the court said: "A different rule would lead to the encouragement of litigation and prevent, in many instances, complete and full enjoyment of the right of property which inheres to the owner of the soil. An idle threat to do what is perfectly lawful, or declarations which assert the intentions of the owner, might often be construed as evincing an improper motive and a malignant spirit, when, in point of fact, they merely stated the actual rights of the party. Malice might easily be inferred sometimes from idle and loose declarations, and a wide door be opened by such evidence to deprive an owner of what the law regards as well-defined rights."

And the evil consequences of such a practice would be much worse in cases of conspiracy, where all are responsible within certain limitations for the acts and declarations of one of their number as to the motives which actuate him, when none of his associates may be moved by it or any other improper motive.

Dr. Wharton, in his Criminal Law (9th ed.), after stating, in section 1337, that it is conceded on all sides that combinations of two or more persons may become indictable when directed to

the accomplishment either of an illegal object or an indifferent object by illegal means, says the conflict in the cases begins when we reach those combinations which are assumed to be indictable, not as aimed at an indictable offense, but from the idea that the policy of the law forbids the reaching of the attempted object by a confederacy; and in section 1338 adds: "But to extend indictable conspiracies so as to include cases where acts not in themselves indictable are attempted by concert, involving neither false statement nor concerted force, should be resolutely opposed. A distressing uncertainty will oppress the law if the mere fact of concert in doing an indifferent act be held to make such act criminal. ' We all know what offenses are indictable, and, if we do not, the knowledge is readily obtained. Such offenses, when not defined by statute, are limited by definitions which long processes of judicial interpretation have hardened into shapes which are distinct, solid, notorious, and permanent. It is otherwise, however, when we come to speak of acts which, though not penal when they are committed by persons acting singly, are supposed to become so when brought about by concert which involves neither fraud nor force. * * * No man can know in advance whether any enterprise in which he may engage may not in this way become subject to prosecution. It is essential to the constitution of an indictable offense * * * that it should be prohibited either by statute or by common law; but conspiracies to commit by non-indictable means non-indictable offenses, if we resolve them into their elements, are neither prohibited by common law nor by statute. * * * An act of business enterprise in purchasing goods in a cheap market for the purpose of selling them in a dear market, which, in one phase of judicial sentiment, would be regarded as meritorious impetus to commercial activity, would be, in another phase of judicial sentiment, as it once has been, treated as an indictable offense."

In reaching the conclusion that the amended warrant does not charge an indictable offense, and that the demurrer to it should have been sustained, we do not wish to be understood as holding that the combination charged in this case may not be prejudicial to the public, and that a sound public policy may not require limiting or suppressing such combinations. But, as was said by the Court

Opinion.

of Appeals of Texas, in *Queen Ins. Co.* v. *Texas, supra,* in holding that a like combination was not a criminal offense at common law: "There are certain contracts, and perhaps combinations, which the law regards as being against public policy. The courts cannot extend the rule merely by reason of their opinion as to what the law ought to be. What other combinations or contracts should be held illegal on the ground of public policy is a political question—that is to say, one which it is the province of the legislative department of the government to determine. The legislature has the power to weigh the public interest, even 'in golden scales,' and, if such combinations be found detrimental, they can denounce the evil and provide the remedy."

The judgment complained of will be reversed, and this court will enter such judgment as the trial court ought to have entered.

*Reversed.*