# 𝔚𝔶𝔱𝔥𝔢𝔟𝔦𝔩𝔩𝔢

WILLIAM G. WERTH, TRADING, ETC. v. FIRE COMPANIES'
ADJUSTMENT BUREAU, INCORPORATED.

June 15, 1933.

Present, All the Justices.

The opinion states the case.

*George M. Warren* and *William H. Werth,* for the plaintiff in error.

*Morton & Parker, Alexander H. Sands* and *D. T. Stant,* for the defendant in error.

BROWNING, J., delivered the opinion of the court.

This case involves the applicability and incident construction of what is known as the anti-trust statute of Virginia. The pertinent parts of the statute are as follows:

"Section 4722 (5). Definition of 'person,' 'persons,' 'trust or monopoly'; a trust or monopoly unlawful and void.— Whereas, section one hundred and sixty-five of the Constitution of Virginia provides that the General Assembly shall enact laws preventing all trusts, combinations and monopolies inimical to the public welfare; therefore,

"Be it enacted by the General Assembly of Virginia, That the word 'person' or 'persons,' as used in this act, includes

corporations, partnerships and associations existing under or authorized by any State or territory of the United States or a foreign country.

"A trust or monopoly is a combination of capital, skill or acts by two or more persons, firms, partnerships, corporations or associations of persons, for any or all of the following purposes:

"(a)   To create or carry out restrictions in trade or business.

\*          \*          \*          \*          \*          \*          \*

"(e)   \* \* \*·Such trust, or monopoly, as is defined herein is unlawful, against public policy and void.

"Section 4722(9).   Damages and costs recoverable by person injured by reason of anything forbidden in act; limitation upon compensation of counsel.—Any person who shall be injured in his business or property by reason of anything forbidden in this act may sue therefor and recover threefold the damages by him sustained, and the costs of suit, including a reasonable fee to plaintiff's counsel, and said counsel shall in no case receive any other, further or additional compensation except that allowed by the court, and any contract to the contrary shall be null and void.

\*          \*          \*          \*          \*          \*          \*

"Section 4722(21).   Construction of act; to what trusts, combinations and monopolies applicable.—The provisions of this act shall be liberally construed in order effectually to secure the enforcement of the provisions hereof for the protection of the people of the Commonwealth, but the act shall apply only to those trusts, combinations and monopolies which are unreasonable or inimical to the public welfare, as hereinbefore defined, and are prohibited and penalized under the provisons of any law of the United States, or would be prohibited and penalized under the provisions of any law of the United States, if their activities extended to interstate as well as intrastate commerce."

For purposes which will presently become manifest, we here set out 15 U. S. C. A. section 1:

"Trusts, etc., in restraint of trade illegal; penalty. Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. Every person who shall make any such contract or engage in any such combination or conspiracy, shall be deemed guilty of a misdemeanor, and, on conviction thereof, shall be punished by fine not exceeding $5,000, or by imprisonment not exceeding one year, or by both said punishments, in the discretion of the court." (July 2, 1890, c. 647, section 1, 26 Stat. 209.)

Article 1, section 8, clause 3, of the Constitution of the United States, provides in part:

"1. The Congress shall have power * * *;

"3. To regulate commerce with foreign nations, and among the several States, and with the Indian tribes; * * *."

From this constitutional authority evolved the Federal anti-trust laws, from which we have quoted, which includes what are known as the Sherman Anti-Trust Act and the Clayton Act (see 15 U. S. C. A. section 1 *et seq.*).

It will be observed that the subject of the above Federal legislation is *commerce,* and the inhibitions of the section quoted are directed to what is called therein "trade or commerce."

In the case of *United States* v. *Patterson* (C. C. D. Mass. 1893) 55 Fed. 605, it was said, with respect to the significance of the word "trade" as used in a similar Federal statute designed to protect trade and commerce from unlawful restraints and monopolies, that the words "trade or commerce" meant substantially the same thing, that they are synonymous.

"The word 'trade,' in its broadest signification, includes not only the business of exchanging commodities by barter, but the business of buying and selling for money, or commerce and traffic generally." *May* v. *Sloan* (Fla. 1879) 101 U. S. 231, 237, 25 L. Ed. 797.

"Through these definitions [of 'commerce'] runs the

idea that trade and commerce require the transfer of something, whether it be persons, commodities, or intelligence, from one place or person to another. The concomitant of this concept is the principle, approved by the Supreme Court of the United States, that 'importation into one State from another is the indispensable element, the test, of interstate commerce.' " *National League, etc.* v. *Federal Baseball Club* (1920) 50 App. D. C. 165, 269 Fed. 681, 684; *Federal Baseball Club of Baltimore* v. *National League* (1922) 259 U. S. 200, 42 S. Ct. 465, 66 L. Ed. 898, 26 A. L. R. 357.

We do not deem it necessary to state the facts of the immediate case in detail, but only such of them as seem important to a clear perspective of the question which we think is controlling and with which we are dealing.

The defendant in the trial court, defendant in error here, is a corporation chartered by the State of New Jersey. It was incorporated under the New Jersey act to incorporate associations not for pecuniary profit; and its purposes, as expressed in its charter, were, in short, to investigate claims and adjust losses on fire and kindred insurance policies, to promote and maintain public goodwill, greater efficiency, and prevent economic waste, develop correct practices in the adjustment of losses, to handle salvages, to acquire information relative to these things and to train and educate adjusters in the handling of adjustments in the interests of the relations of stock fire insurance to the public.

The defendant corporation was organized and sponsored by another corporation known as The National Board of Fire Underwriters of the United States, which was composed of stock fire insurance companies of this and other countries, which had for its purposes, in general, the promotion, development and administration of the fire insurance business of the country.

These two corporations appear to have been non-stock-issuing companies without profit or pecuniary features or benefits save those which would consequentially and in-

cidentally flow to them from economical and wise, in their view, administration of the business with which they were concerned. The adjustment of fire losses is one of the major and vital functions of the entire business scheme. Before the organization of the defendant, losses were adjusted through the services of independent insurance adjustment bureaus operating throughout the country and individuals or firms or persons of more or less ability and experience, holding themselves out as capable, and who were in fact so, in many instances, to conduct, handle and transact such business. These latter were known as and called "independent adjusters," and to this class the plaintiff belongs.

The National Board of Fire Underwriters of the United States, the parent of the defendant, was organized in 1863 as a voluntary association, with what membership in numbers does not appear, but, at the time of the creation of the defendant corporation, it had a membership of 241 stock fire insurance companies which represented ninety per centum of the fire insurance written in the United States and eighty-eight per centum and ninety-two per centum of that written in Virginia and Tennessee, respectively.

As early as 1927, at least, the membership of this organization became exercised in the solving of the problems, referred to as constituting the purposes of the defendant, which led to the appointment of appropriate committees and general discussion of the matters, which culminated in the adoption, at the annual meeting of the national board in 1929, of a proposal to form the defendant corporation. These problems and these discussions, and the pursuant resolutions adopted, were its genesis.

At the meeting referred to, and during the discussion as to the advisability of the plan, objection was urged to it by the executive head of one of the large and important insurance companies, as creating a monopoly and tending to the establishment of bureaucracy.

The resolution adopted, which was the immediate progenitor of the defendant corporation, stated in terms that the

ultimate object of the bureau was to have every feature arising out of losses referred to it by companies, handled by salaried adjusters under its control, and provided for the automatic handling of all losses, coming within certain specific designations as to amount in money of such losses, by the bureau. The automatic feature of the scheme was never put into effect, and it was finally abandoned. It was also provided that the able independent adjusters throughout the country would be given an oportunity to become affiliated with the bureau. It was further stipulated that any company member having its own salaried adjuster might have him act in the adjustment of losses, or in the event that it had none, then it might assign an independent adjuster on a loss. This was to be effected by specific notice thereof to the bureau. Much of the complaint of the members of the parent company was as to the existent evil of what was termed "soft adjustments."

For about four years prior to the creation of the defendant corporation, the plaintiff was a salaried adjuster for the General Adjustment Bureau, with his office at Bluefield, West Virginia. On February 1, 1930, he severed that connection and opened an office at Bristol, Virginia, as an independent adjuster, from which extended in all directions a considerable area of country in which no adjuster of any sort was located. Soon after the plaintiff opened his office in Bristol, a representative of the defendant corporation communicated with him in person with the view of engaging his services, or having him affiliated with it, in the operation of its office in the same city which it had theretofore determined to open. They could not agree upon the terms of connection, and on July 1, 1930, the defendant established its office at the same place. For the first five months of his occupancy of the field as an adjuster, without competition, the plaintiff prospered materially, but after the establishment by the defendant of its office and its personnel his monthly income decreased correspondingly, and the defendant's business grew to prosperous proportions.

The plaintiff's testimony, not contradicted, was that during the period of his business activities in Bristol, Virginia, and prior to the entry of the defendant into the field, he had been employed as an adjuster by some fifty-eight stock insurance companies and subsequently this representation was reduced to three or four companies as his regular employers, and some others intermittently in cases of small losses which came to him through agents rather than the companies.

The adjustment bureaus, which were predecessors of the defendant, were absorbed by it by the purchase of their office equipment, etc., and the retention or affiliation of their personnel, which was in accordance with the plan. When the creation of the defendant was accomplished that fact was announced to the constituent members of the national organization through the medium of a letter, written by the chairman of the committee on losses and adjustments, in which it was stated that the southern adjustment branch of the defendant corporation was then an operating entity in the territory in question and that its personnel had the unqualified endorsement of the national organization; and the addressee was asked to inform those having to do with the assignment of its losses, not handled by its own salaried staff or fieldmen, that preference was to be given to the defendant.

The manager of the defendant's branch office at Bristol, in writing to the general manager in Atlanta reporting the progress of his offices, stated that it had received the generous support of the agents and the companies, and as a result the plaintiff was "fighting for a livelihood."

The plaintiff instituted suit by an action of trespass on the case, embracing two counts, in the first of which he complained that he had been deprived of his existing and future business by the defendant's operation as a monopoly in violation of the Virginia "Anti-Trust Law" by virtue of its automatic assignment plan, etc.; and in the second he complained that the defendant unlawfully and maliciously con-

spired together with the officers of the national organization and its own trustees and subordinate officers and employees to monopolize the fire-loss-adjustment business by excluding plaintiff and all others engaged in such business from operating in the territory in question, and the offenders, with a common purpose and design, combined and agreed together to effect such result. Papers with reference to the plan, consisting of the minutes and proceedings of the annual meeting of the national organization, certain charters, constitution, by-laws, letters, etc., were in evidence by virtue of the issuance of subpoenas *duces tecum,* and the testimony of witnesses and other documentary evidence was had, and the case was submitted to the court for its determination without the aid of a jury.

The plaintiff alleged actual damages in specific amounts to his existing business, to the deprivation of the future earning power of his established business, to his good will as an asset of his business, and claimed punitive and/or exemplary damages and the three-fold statutory penalty. All the elements of damage aggregated the sum of $75,000. The court gave judgment for the defendant, and the plaintiff is here complaining of alleged error.

The evidence does not, in our opinion, sustain the charge of conspiracy.

■■ "A conspiracy consists of an unlawful combination of two or more persons to do that which is contrary to law, or to do that which is wrongful and harmful towards another person. It may be punished criminally by indictment, or civilly by an action on the case in the nature of conspiracy if damage has been occasioned to the person against whom it is directed. It may also consist of an unlawful combination to carry out an object not in itself unlawful by unlawful means. The essential elements, whether of a criminal or actionable conspiracy, are, in my opinion, the same, though to sustain an action special damage must be proved." The above was said by Lord Brampton in the case of *Quinn* v. *Leathem* [1901] A. C. 495, 70

L. J. P. C. 76, 65 J. P. 708, 50 W. R. 139, 85 L. T. N. S. 289, 17 Times L. Rep. 749, 1 British Rul. Cas. 197. See, also, 5 R. C. L. 1091, section 41; Amer. & Eng. Ency. of Law (2d ed.) 832; *Harris* v. *Com.*, 113 Va. 746, 73 S. E. 561, 38 L. R. A. (N. S.) 458, Ann. Cas. 1913E, 597.

■ "The mere operation of a lawful business by lawful means, as a combination between corporations or individuals to draw to themselves business from other competitors, however hurtful to the latter, is not a conspiracy which is actionable." 5 R. C. L. 1095, section 44.

In the case of *West Virginia, etc., Co.* v. *Standard Oil Co.*, 50 W. Va. 611, 40 S. E. 591, 594, 56 L. R. A. 804, 88 Am. St. Rep. 895, it was said:

■ "Counsel for plaintiff put emphasis on the charge of conspiracy and malice, but there can be no conspiracy to do a legitimate act, an act which the law allows, nor malice therein. To give action there must not only be conspiracy, but conspiracy to do a wrongful act. If the act is lawful, no matter how many unite to do it. *Bohn Mfg. Co.* v. *Hollis*, 54 Minn. 223, 55 N. W. 1119, 21 L. R. A. 337, 40 Am. St. Rep. 319. * * *

" 'It is no crime for any number of persons, without any unlawful object in view, to associate and agree that they will find work for or deal with certain men, or classes of men, or work under a certain price, or without certain conditions.' *Carew* v. *Rutherford*, 106 Mass. 1, 14, 8 Am. Rep. 287."

"The definition or description which seems to be more generally adopted is that a conspiracy must be a combination of two or more persons, by some concerted action, to accomplish some criminal or unlawful purpose, or to accomplish some purpose, not in itself criminal or unlawful, by criminal or unlawful means." *Harris* v. *Com.*, 113 Va. 746, 73 S. E. 561, 562, 38 L. R. A. (N. S.) 458, Ann. Cas. 1913E, 597, and cases there cited.

■ In the case in judgment the national organization conceived the plan to effect the being of the defendant corporation and to apply its operation to the area in question

before the plaintiff became an independent adjuster and before either had knowledge of his existence as such. We think it cannot be reasonably contended that the purposes were aimed at him more than any other adjuster who might be operating in the field of competition.

We perceive in the plan no element of force or compulsion. Any member of the National Board of Fire Underwriters may employ an independent adjuster. It is true that the purpose of the corporation is to effect the cooperation of the member companies to have the defendant adjust fire losses, for reasons lawful in themselves and by means not unlawful. Neither the plan nor the evidence show that any member company is compelled to employ the defendant to adjust its losses. The fact is, the plaintiff is still employed by a number of such companies. Applying the law, as we conceive it to be, to the facts in the case in judgment, the complaint of the plaintiff of the existence of a common law conspiracy is unsupported by the record.

We come now to the consideration of a controlling element which, we think, is quite enough to decide the case. The Virginia anti-trust statute was amended in 1926, which amendment is indicated by the italicized words found in the last section of the act, Code 1930, section 4722, subsection 21: "* * *, but the act shall apply only to those trusts, combinations and monopolies which are unreasonable or inimical to the public welfare, as hereinbefore defined, *and are prohibited and penalized under the provisions of any law of the United States, or would be prohibited and penalized under the provisions of any law of the United States, if their activities extended to interstate as well as intrastate commerce.*"

In the case of *Norfolk Motor Exchange* v. *Grubb*, 152 Va. 471, 147 S. E. 214, 216, 63 A. L. R. 310, it was said (Mr. Justice Holt delivering the opinion of the court): "From this it appears that our legislature, in a general way, intended that those Code provisions noted should be so construed as to place them, as near as may be, in line with Federal anti-trust laws, and as a necessary corollary it follows

that we should adopt the 'rule of reason' as it has been developed by the Federal courts in the construction of cognate Federal statutes—not that these decisions control, as they would were those statutes themselves under construction, but because they were highly persuasive."

The amendment of 1926, above referred to, is a qualifying clause or proviso which limits the operation and effect of the act to "trusts * * * which are * * * prohibited and penalized under the provisions of any law of the United States * * *, if their activities extended to interstate * * * commerce." The provisions of the Federal anti-trust laws, of course, have only to do with trade or commerce which is interstate in character. No activity of the trusts, combinations and monopolies referred to in the Virginia statute, which is not embraced within the meaning of the term "commerce" comes under the condemnation of the Federal laws on the subject, because the constitutional power of Congress to enact such laws is limited to the regulation of commerce.

If insurance, and the activities which grow out of it, of which the adjustment of losses is one of the most vital, is not trade or commerce in the statutory sense then it is not "prohibited and penalized" by the Federal anti-trust laws, and if it is not condemned by those laws, it is not condemned by the Virginia law. This must be so or the proviso in the latter law could have no effect, which cannot be in view of the law governing the construction of a proviso in the relation to a statute of which it is a part and to which it must have some application. 25 R. C. L. 985, section 232, and cases there cited; *Jordan et als.* v. *South Boston,* 138 Va. 838, 122 S. E. 265; Black on Interpretation of Laws, 220; 58 C. J. 1090, section 641.

Is insurance, with its attendant or incident activities, comprehended within the term "commerce" or its synonym "trade"? It has been repeatedly held not to be by many of the courts of the land, including the Supreme Court of the United States and this court.

"Issuing a policy of insurance is not a transaction of commerce. * * * These contracts are not articles of commerce in any proper meaning of the word. They are not subjects of trade and barter offered in the market as something having an existence and value independent of the parties to them." *Paul* v. *Virginia,* 8 Wall. (U. S.) 168, 183, 19 L. Ed. 357; *Harris* v. *Com.,* 113 Va. 746, 73 S. E. 561, 38 L. R. A. (N. S.) 458, Ann. Cas. 1913E, 597; *State of Kansas* v. *Phipps,* 50 Kan. 609, 31 P. 1097, 18 L. R. A. 657, 34 Am. St. Rep. 152; *Queen Ins. Co.* v. *State,* 86 Tex. 250, 24 S. W. 397, 22 L. R. A. 483.

In *Hooper* v. *California,* 155 U. S. 648, 655, 15 S. Ct. 207, 210, 39 L. Ed. 297, it was said: "The business of insurance is not commerce. The contract of insurance is not an instrumentality of commerce."

Of kindred application is the case of *Continental Ins. Co.* v. *Board of Fire Underwriters* (C. C.) 67 Fed. 310. The opinion was delivered by McKenna, judge of the United States Circuit Court for the Northern District of California, who was subsequently an associate justice of the Supreme Court of the United States. The first paragraph of the syllabus is this:

"An association of fire underwriters, formed under an agreement providing for the regulation of premium rates, the prevention of rebates, the compensation of agents, and non-intercourse with companies not members, is not an illegal conspiracy, and the accomplishment of its purposes by lawful means will not be enjoined at the instance of a company not a member of the association."

In considering this case with its many puzzling and vexing ramifications, we have had before us briefs of counsel which are remarkable for their learning and forceful reasoning, but to say more than we have would lead us into wide fields of argument extending this opinion to lengths not necessary to the decision.

We affirm the judgment of the trial court.

*Affirmed.*