ESSEX COUNTY COURT OF OYER AND TERMINER.

STATE OF NEW JERSEY v. RAYMOND BLACK ET AL.

Decided June 6, 1927.

A combination to monopolize is not *per se* indictable since the repeal of chapter 13 laws of 1913.

On motion to quash an indictment.

For the state, *Joseph L. Smith* (*John O. Bigelow,* of counsel).

For the defendants, *William A. Wachenfeld, Harold Simandl* and *Benjamin M. Weinberg.*

FLANNAGAN, J. The indictment alleges a combination to monopolize, for the members of a certain association, the sale at retail of kosher meat and to control the retail price thereof.

The methods which the defendants are alleged to have undertaken to employ were two—*first,* by preventing competitors from obtaining certain certificates or signs customarily used and signifying that meats offered are prepared kosher, and, *second,* by preventing competitors from obtaining kosher meats from wholesalers.

Such certificates or signs, it is alleged, may be furnished by a rabbi or by the organization known as Vaad Hakashruth.

It is alleged that the conspiracy contemplates the impoverishment and ruin of competitors but this adds nothing to the allegation of intent to monopolize, for every attempt to monopolize must necessarily be taken to contemplate and involve, in order to maintain the monopoly, the destruction of the business of competitors, if not *in presenti* then *in futuro;* for the moment an outsider establishes a like busi-

ness monopoly ceases to exist, so that competitors, as they appear from time to time, must be disposed of.

It is further alleged that a purpose of the monopoly was to enhance the retail price of kosher meat, but it is not alleged that it was intended to do so to the extent of unreasonableness. The allegation that prices were merely to be enhanced also adds nothing. The characteristic of uncontrolled monopoly is its ability to control and vary prices at will from those which the natural course of supply and demand would establish. This control, unless in the meanwhile human nature be revolutionized, must sooner or later, when favorable opportunity presents, normally result in the enhancement of prices.

Three overt acts are alleged to have occurred in execution of the conspiracy and to effect the objects thereof—*first,* one of the conspirators, on June 8th, 1926, solicited an employe of a wholesale dealer (who was not a member of the association) not to sell to any retailers except members of the association; *second,* two of the conspirators, on September 2d, 1926, made the same solicitation of another wholesale dealer (not a member of the association); and, *third,* still another conspirator, on September 6th, 1926, refused to sell to a retailer who was not a member of the association.

It is not alleged that these requests to wholesalers, outside the association, not to sell except to retailers in the association, were accompanied by any violence, threats, fraud or compulsion, or that they amounted to anything more than persuasion. Nor is it alleged that the refusal of the member of the association to sell to a non-member covered anything more than a single sale, or that such refusal was because the proposed purchaser was not a member, or that it was based on anything more than persuasion.

It is not pretended or alleged that the conspirators controlled the rabbis or Vaad Hakashruth or were to prevent the obtaining of certificates from them, or obstruct the obtaining of kosher meats from wholesalers by any particular means. It is not alleged that violence, intimidation, fraud, deceit, or any other illegitimate means, was contemplated to be used,

nor is it indicated that any means except persuasion was proposed.

There would be nothing illegal in the members of the association endeavoring to persuade the rabbis and the Vaad Hakashruth that their facilities were ample and that additional retail stores would, by over-competition, result in a deteriorated and less healthful service; and there would be nothing illegal in the members of the association trying to persuade wholesalers to sell their supply to them on the ground that their financial responsibility and terms of payment were better than what their competitors were in a position to offer.

There is therefore no charge in the indictment of any criminal, illegal or illegitimate methods to be employed by the conspirators to accomplish their purpose, and the question which remains is the broad one, whether or not it is *per se* criminal in this state to combine to establish a monopoly.

Since the repeal by chapter 143 of the laws of 1920, of chapter 13 of the laws of 1913 (one of the famous "Seven Sisters" so-called), there is no statute in New Jersey making it criminal to create a monopoly.

This is not questioned by counsel for the state in the brief which he has prepared with much ability and learning, but he contends that a conspiracy to monopolize was criminal at common law and hence is indictable in New Jersey. The question presented is whether or not this claim is well founded. The scope of criminal conspiracy at common law has been widely discussed and the difficulty of defining is well recognized. *Wright Cr. Consp. & Agr. (London,* 1873), 66, 67; 2 *Steph. Hist. Cr. L. (England)* 227, 229; *State* v. *Bienstock,* 78 *N. J. L.* 256 (at *p.* 269).

Whether a conspiracy to monopolize is criminal at common law has never been directly passed upon by the courts of New Jersey, but it has been touched upon here and widely discussed elsewhere.

In the eighteenth and nineteenth centuries under the common law and statutes as then existing, it would seem that in

41

England the defendants might have been indictable for such a conspiracy, but largely because of statutes. 3 *Steph. Hist. Cr. L. (England)* 226, 227.

Under the modern British law, however, it has been held that a combination of persons in a trade to keep outsiders from pursuing that trade is not unlawful. *Mogul S. S. Co. v. McGregor* (1892), *L. R. App. Cas.* 25, 35, 40, 41, 60.

The most conspicuous case discussing the question as to whether a conspiracy to monopolize was criminal at common law is one in which the opinion was written by Chief Justice Taft (then Circuit Judge). His remarks were by way of *dicta*, but they form the basis of many of the decisions since that time. He says:

"Contracts that were in unreasonable restraint of trade at common law were not unlawful in the sense of being criminal or giving rise to a civil cause for damages in favor of one prejudicially affected thereby, but were simply void and were not enforced by the courts. *Mogul S. S. Co. v. McGregor* (1892), *L. R. App. Cas.* 25; *Hornby v. Close,* 2 *L. R. Q. B.* 153; Chief Justice Lord Campbell in *Hilton v. Eckersly,* 6 *El. & B.* 47; Justice Hannen in *Farrer v. Close,* 4 *L. R. Q. B.* 602, 612;" *United States v. Addyston Pipe and Steel Co.,* 85 *Fed. Rep.* 271, 278, 279; *affirmed,* 175 *U. S.* 211.

I am quite satisfied that the weight of authority outside the State of New Jersey supports the chief justice's view. *State v. Van Pelt,* 136 *N. C.* 633, 652, 656; *Macauley v. Tierney,* 19 *R. I.* 255, 264; *State v. Scollard,* 126 *Wash,* 335, 339, 340; *Transportation Co. v. Oil Co.,* 50 *W. Va.* 612, 617, 627; *Bowen v. Matheson,* 96 *Mass.* 499, 502, 504; *Cote v. Murphy,* 159 *Pa.* 420, 425, 432; *Buchanan v. Kerr,* 159 *Pa.* 433, 435; *Bohn Manufacturing Co. v. Hollis* 54 *Minn.* 223, 232, 234; *Harris v. Commonwealth,* 113 *Va.* 746; *National Protective Association v. Cumming,* 170 *N. Y.* 315, 321, 333; *Paine Lumber Co. v. Neal,* 244 *U. S.* 459, 471; *Bossert v. Dhuy,* 221 *N. Y.* 342, 358, 360.

In New Jersey, as already stated, there is no case directly in point, but the *dictum* of Chief Justice Taft is approved

in a *dictum* by Vice Chancellor Stevens in *McCarter* v. *Firemen's Insurance Co.*, 70 *N. J. Eq.* 291, 293, 294, where the Vice Chancellor says:

"In the case of *United States* v. *Addyston Pipe and Steel Co.*, 29 *C. C. A.* 147, Judge Taft, in an exhaustive and illuminating opinion on the subject of contracts in restraint of trade, says: 'Contracts that were in unreasonable restraint of trade at common law were not unlawful in the sense of being criminal' " (at *p.* 293).

The case was appealed to the Court of Errors and Appeals and the Vice Chancellor's decision was there reversed by a vote of seven to four (see 74 *N. J. Eq.* 372), but the question of the criminality of a conspiracy to create a monopoly (not being involved) was not touched upon by the majority. The minority, however, consisting of the Chief Justice and Justices Swayze, Reed and Bergen, in an opinion written by Mr. Justice Swayze, say, in referring to the contract then before the court (and so far as criminality is concerned, by way of *dicta*)—

"Even if the contract were invalid, I agree with the learned Vice Chancellor that the only effect is that it is unenforcible. It is sufficient to justify that view to quote from the famous opinion of Judge Taft, upon which the learned Vice Chancellor relied. *United States* v. *Addyson Pipe and Steel Co.*, 85 *Fed. Rep.* 271. The court said that contracts that were in unreasonable restraint of trade at common law were not unlawful in the sense of being criminal, &c. 74 *N. J. Eq.* 372 (at *pp.* 411, 412)."

A very thorough and instructive discussion by Arthur W. Allen is found in the 23 *Harvard Law Rev.* (1909-10), *tit.* "*Criminal Conspiracies in Restraint of Trade,*" 531. The author, after reviewing fully the English and American decisions upon the common law, reaches the following conclusion (at *p.* 547):

"The difficulties of framing any fair rule of definition brings one inevitably to the conclusion that the best solution of the problem is to say with Judge Taft that trade agreements are not punishable under the rules of the common

law, and then to look to the legislature to pass adequate and definite measures to protect the public."

The weight of authority outside this state, supported by the dicta in New Jersey above quoted, leads me to hold that a conspiracy to monopolize was held at common law not to be criminal.

The case of State v. Bienstock, 78 N. J. L. 256, referred to by both sides, is not in point. It holds that a combination to count and tally three hundred · ballots as cast at a primary election for delegates to the state and congressional district elections, which were not in fact actually cast or voted, was a criminal conspiracy at common law. It would be difficult to see how such a conspiracy could be regarded otherwise than as a cheat and a fraud upon the public.

The discussion in that case was as to whether or not the principles of the common law, when applied to the state of fact disclosed, required that an indictment be quashed though the question involved had never been raised at common law and, probably, under the conditions existing at common law could never have arisen. 78 N. J. L. 276, 277. In the instant case no fraud or cheat is alleged and the question is as to what has already been decided at common law.

It is urged in behalf of the state that the court should lean toward the state in considering the motion, for the reason that, while the defendants can review a decision denying the motion, if the court should grant the motion and quash the indictment, the state cannot review such action, and would thus be left helpless.

It is quite true that a motion to quash, as a general rule, is addressed to the discretion of the court and is not reviewable on writ of error, but this rule "is not applied when the motion is rested upon the failure of the indictment to charge a crime," as is the fact in the instant case (State v. Mandeville, 88 N. J. L. 418) and the state has, therefore, the right of appeal. Moreover, the state has a complete remedy in equity by injunction at the instance of the attorney-general. McCarter v. Firemen's Insurance Co., 74 N. J. Eq. 372.

The indictment should be quashed.